**C.L.E.A.N., LLC., Appellant,**

v.

**DIVISION OF EMPLOYMENT SECURITY, Respondent.**

No. WD 75561.

Missouri Court of Appeals, Western District.

Aug. 13, 2013.

Gretchen E. Gaynor, for Appellant.

Bart A. Matanic, for Respondent.

Before Special Division: JOSEPH M. ELLIS, Presiding Judge, GARY D. WITT, Judge and ROBERT M. CLAYTON, III, Special Judge.

JOSEPH M. ELLIS, Judge.

Appellant C.L.E.A.N., LLC, appeals from a decision entered by the Labor and Industrial Relations Commission ("the Commission") in which the Commission found that since January 1, 2008, twenty-six of C.L.E.A.N.'s workers performed services for wages in employment. C.L.E.A.N. avers that the Commission's decision is erroneous because its workers are independent contractors, not employees, and because it was denied fair proceedings in front of the Appeals Tribunal. For the following reasons, the judgment is affirmed.

Organized in 2004, C.L.E.A.N. is a limited liability company that specializes in residential cleaning. C.L.E.A.N.'s sole member, Robin Wittenborn, owns and operates the business out of her home in Ballwin, Missouri.

Since its inception, C.L.E.A.N. has engaged workers to provide cleaning services in its clients' homes. C.L.E.A.N. finds workers by advertising in newspapers, local journals, and the Internet. C.L.E.A.N. has each worker sign an "independent contractor agreement" in which the worker agrees to provide "detailed and conscientious cleaning" services at the homes to which he or she is assigned. The agreement further provides that the worker "will be responsible for successfully completing the [cleaning assignment] according to [the] specifications and expectations of the cleaning checklist, in a timely and professional manner."

C.L.E.A.N. also requires its workers to sign an agreement entitled "Performance Bonus: 10% of Gross." The agreement sets forth the responsibilities and duties C.L.E.A.N. expects from its workers as "partners" in "the growth of a residential cleaning service." The Performance Bonus agreement further contains a section entitled "Rules," which outlines a progressive penalty system for workers that fail "to maintain the high standards [C.L.E.A.N.] uphold[s]." The penalties range from loss of the 10% Performance Bonus to termination.[1] The agreement also gives C.L.E.A.N. the right to immediately terminate its "business partnership" with a worker as a result of any misconduct, such as lying, cheating, or stealing.

Additionally, workers have to sign an "Independent Contractor Non–Compete Agreement." The non-compete agreement provides: "The Independent Contractor agrees that during the time of her service with the contractor, she will not accept nor will she engage in employment, consulting

---

1. The "Rules" section of the Performance Bonus agreement specifically provides:
   If at any time an issue or failure to maintain the high standards we uphold occurs there will be a penalty.
   1st offense will be a verbal warning plus loss of performance bonus.
   2nd offense will be a warning plus loss of payment and bonus.
   3rd offense will be a warning, loss of GROSS bonus and the house will be assigned to another partner. Loss of business? TERMINATION!

   4th offense will be termination of partnership no explanation necessary.
   The agreement defines an "issue" as "[a] customer call or written complaint or note received" such as "[s]pots from scud marks on the floor, smears on the mirrors, fingerprints on the glass, polish too quickly, [and] overlooking objects not moved." Any "issues" result in the "immediate loss of the 'performance bonus.'"

or any other business activity, directly related to the business of the Contractor." The non-compete goes on to state that upon termination, "the independent contractor agrees not to engage directly or indirectly in any business substantially similar to or in competition with the business of the Contractor ... for a period of 1 years [sic] ... within a radius of 20 Miles from" C.L.E.A.N.'s office in Ballwin, Missouri. For purposes of the non-compete agreement, engaging in any business substantially similar to or in competition with the business of the contractor means "(i) engaging in a business as an owner, partner, or agent; (ii) taking employment with a third party engaged in such business either as an employee, contractor, or consultant; [or] (iii) soliciting customers for the benefit of a third party engaged in such business."

Before officially performing services for C.L.E.A.N., workers must accompany either Wittenborn or other experienced C.L.E.A.N. workers and assist them in cleaning anywhere between five to eight homes belonging to C.L.E.A.N. clients. Workers are not compensated for these initial cleanings, which Wittenborn deems "situational interviews." During these cleanings, Wittenborn or other C.L.E.A.N. workers demonstrate how to clean the homes of C.L.E.A.N. clients. C.L.E.A.N. further requires its workers to organize limited liability companies after the worker earns over $600.00 working for the company. On at least one occasion, C.L.E.A.N. threatened to withhold a worker's pay if she did not form an LLC.

When a potential customer contacts C.L.E.A.N., Wittenborn goes to the potential customer's home to perform an initial cleaning and give the client an estimate. Once the customer agrees to be C.L.E.A.N.'s client, Wittenborn calls a worker and offers him or her the assignment of cleaning the new client's home. Workers are free to accept or decline the assignment. If the worker accepts the assignment, Wittenborn provides the worker with a customer data sheet, or cleaning checklist, which lists the client's preferences and gives a detailed cleaning list for that particular customer. Wittenborn also informs the assigned worker of the client's preferred cleaning day and time. Workers are responsible for scheduling and rescheduling of cleanings with the customers. Nevertheless, workers must inform Wittenborn of all scheduled and rescheduled cleanings. Workers are required to provide cleaning services to the satisfaction of the customer within twenty-four hours of the scheduled cleaning.

To ensure its workers have the proper cleaning equipment and supplies, C.L.E.A.N. offers to lease its workers the necessary equipment, materials, and supplies. Workers renting C.L.E.A.N.'s equipment are required to sign an "Independent Contractor Equipment Lease Agreement," which provides that Wittenborn, as the owner and operator of C.L.E.A.N., agrees to lease all equipment, supplies, products, and materials necessary to clean a customer's home for a fee of $10.00 a week (Monday through Friday). The agreement further states that the workers are liable for any lost or damaged equipment and that Wittenborn can withhold a worker's pay until the equipment is returned. The $10.00 rental fee, which is non-negotiable, is deducted from the worker's weekly pay.

Ninety percent of C.L.E.A.N. workers rent their cleaning equipment and supplies from C.L.E.A.N. C.L.E.A.N. stores the equipment and supplies, including the cleaning solutions that Wittenborn mixes herself, at its office in Wittenborn's home. Workers take the supplies and equipment

they deem necessary to clean their assigned homes for the week. No inventory is kept of the amount of supplies and materials used by the C.L.E.A.N. workers each week.

While in a client's home, the workers hold themselves out to be representatives of C.L.E.A.N. Once finished cleaning the client's home, the worker leaves a C.L.E.A.N. business card that contains C.L.E.A.N.'s contact information. Workers can write their name on the business card as well as their voicemail message box number if the worker has one set up with C.L.E.A.N. Any payment a worker receives from a C.L.E.A.N. client is to be handed over to Wittenborn. C.L.E.A.N.'s clients always make their checks payable to C.L.E.A.N.

On Friday of each week, C.L.E.A.N. workers are required to submit a statement to C.L.E.A.N. listing the homes they cleaned that week. Wittenborn requires the statements to be made on a particular form and instructs the workers how to fill out and calculate the form. Workers are paid 40% commission for each home they clean and a 10% performance bonus based upon the totals reflected on their weekly statements.[2]

The workers can terminate their relationship with C.L.E.A.N. at any time by providing written or oral notice to the company. All agreements between C.L.E.A.N. and the worker become null and void after twenty-four hours of notification being given.

In 2005, the Division of Employment Security ("the Division") investigated C.L.E.A.N. for failing to pay unemployment security taxes. The Division determined that C.L.E.A.N.'s workers performed services for wages in employment, and, thus, C.L.E.A.N. was an employer subject to the Missouri Employment Security Law. The Commission affirmed the Division's decision. Since then, C.L.E.A.N. has failed to comply with the Division's requests that it file quarterly contribution and wage reports and continues to maintain that its workers are independent contractors, not employees.

In 2011, the Division conducted another investigation into the working relationship between C.L.E.A.N. and its workers. Auditor Robin Cleveland ("the Auditor") determined that 27 of C.L.E.A.N.'s workers performed services in employment as defined in § 288.034 and, therefore, were not independent contractors. C.L.E.A.N. appealed the Division's determination to the Appeals Tribunal.

On November 8, 2011, an Appeals Tribunal referee ("the Referee") conducted a hearing on whether the Division correctly determined that C.L.E.A.N. workers performed services in employment for wages. At the hearing, the Auditor and two former C.L.E.A.N. employees, Kimberly Steger and Crystal Roark, testified as witnesses for the Division. Wittenborn, acting *pro se*, represented and testified on behalf of C.L.E.A.N. The specifics of the witnesses' testimony at the hearing will be discussed *infra* as necessary.

On December 20, 2011, the Referee entered the Decision of the Appeals Tribunal, in which she affirmed the Division's determination that C.L.E.A.N.'s 27 workers performed services for wages in employment. In reaching that decision, the Referee analyzed C.L.E.A.N.'s relationship with its workers by applying the

**2.** C.L.E.A.N. retains the remaining 50% of the money earned for each cleaning job. C.L.E.A.N. also retains a worker's 10% performance bonus if the worker were to lose it for any reason. Thus, C.L.E.A.N. retains at least 50% of the money earned on each cleaning job, if not more.

twenty factors identified by the Internal Revenue Service ("IRS") that are used as guides in determining whether sufficient control is present to establish an employer-employee relationship. *See* Rev. Rul. 87–41, 1987–1 C.B. 296. Of the twenty factors, the Referee determined that four favored independent contractor status: (1) Workers were free to establish the order or sequence in which the work was accomplished; (2) the workers were paid a straight commission, not by the hour, week, or month; (3) the workers were not required to work full time for C.L.E.A.N.; and (4) C.L.E.A.N. did not pay its workers' business or travel expenses. The Referee found that the remaining fifteen factors favored employee status. The Referee then explained that "[t]he customers were customers of C.L.E.A.N." and that C.L.E.A.N.'s "overriding objective was to provide customer service to C.L.E.A.N. LLC's standards" which, under the circumstances, "necessitated C.L.E.A.N. LLC retaining the right to control the manner and means by which the residential cleaners actually performed the cleaning services." Thus, the Referee concluded that C.L.E.A.N. workers were employees and not independent contractors.

C.L.E.A.N. appealed the Appeals Tribunal's decision to the Commission. On July 5, 2012, the Commission entered its decision, which affirmed in part and reversed in part the Appeals Tribunal's decision. The Commission agreed that "the majority

of factors, and [C.L.E.A.N.'s] retention of the right to control the Workers' means of performing (and not just the end results) ... point to an employer-employee relationship." However, the Commission found that the fact that C.L.E.A.N. workers perform cleaning services at clients' homes instead of doing work on C.L.E.A.N.'s premises slightly favors independent contractor status. The Commission also determined that one C.L.E.A.N. worker, Bridget Beddow, was an independent contractor because Beddow "operated as an independently established cleaning business" over whose operation C.L.E.A.N. had no control.[3] Thus, the Commission reversed the Appeal Tribunal's decision as to Bridget Beddow, but affirmed the decision of the Appeals Tribunal that the remaining 26 workers were employees, not independent contractors.

■■■ C.L.E.A.N. now appeals from the decision of the Commission, raising two points of error. We review the Commission's decision pursuant to § 288.210,[4] which provides:

> The findings of the commission as to the facts, if supported by competent and substantial evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the appellate court shall be confined to questions of law. The court, on appeal, may modify, reverse, remand for rehearing, or set aside the decision of the commission on the following grounds and no other:

---

**3.** The Commission determined that Beddow worked for C.L.E.A.N. as an independent contractor based upon the following evidence: Ms. Beddow operated her own, independent business called B.B.'s Cleaning, LLC. She had her own business cards for this business. Ms. Beddow had told [C.L.E.A.N.] that any B.B.'s business would take priority over [C.L.E.A.N.'s] business. She advertised this business, which had its own office. She had a financial investment

in her business. Ms. Beddow had 20 years experience, required no training, was not supervised, and was not restricted from competing.

The Division does not contest the Commission's findings that Beddow worked as an independent contractor for C.L.E.A.N.

**4.** All statutory citations are to RSMo 2000 unless otherwise noted.

(1) That the commission acted without or in excess of its powers;

(2) That the decision was procured by fraud;

(3) That the facts found by the commission do not support the award; or

(4) That there was no sufficient competent evidence in the record to warrant the making of the award.

*See also Haggard v. Div. of Emp't Sec.,* 238 S.W.3d 151, 153 (Mo. banc 2007). "We will affirm the Commission's decision if we find, upon a review of the whole record that there is sufficient competent and substantial evidence to support the Commission's decision." *E.P.M. Inc. v. Buckman,* 300 S.W.3d 510, 513 (Mo.App. W.D.2009) (internal quotation omitted). "[W]e owe no deference to the Commission's conclusions of law or application of the law to the facts." *Id.* (internal quotation omitted). We do, however, "defer to the Commission on issues involving the credibility of witnesses and the weight to be given their testimony." *Id.* (internal quotation omitted).

█ In its first point, C.L.E.A.N. contends that the Commission's decision that the majority of its workers were employees and not independent contractors is against the weight of the evidence. "The

Division 'determines whether a worker is an employee or an independent contractor pursuant to 8 CSR 10–4.150(1) and section 288.034.5.'" *Id.* (quoting *Haggard,* 238 S.W.3d at 156). Section 288.034.5 provides:

Service performed by an individual for remuneration shall be deemed to be employment subject to this law unless it is shown to the satisfaction of the division that such services were performed by an independent contractor. In determining the existence of the independent contractor relationship, the common law of agency right to control shall be applied. The common law of agency right to control test shall include but not be limited to: if the alleged employer retains the right to control the manner and means by which the results are to be accomplished, the individual who performs the service is an employee. If only the results are controlled, the individual performing the service is an independent contractor.

8 CSR 10–4.150(1) provides:

In order to interpret section 288.034.5, RSMo, effective June 30, 1989, the division shall apply the common law rules applicable in determining the employer-employee relationship under 26 U.S.C, Section 3306(i).[5] In applying the provi-

5. I.R.C. § 3306(i) provides: "For purposes of this chapter, the term "employee" has the meaning assigned to such term by section 3121(d), except that paragraph (4) and subparagraphs (B) and (C) of paragraph (3) shall not apply." I.R.C. § 3121(d) provides, in pertinent part:

For purposes of this chapter, the term "employee" means—
(1) any officer of a corporation; or
(2) any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee; or
(3) any individual (other than an individual who is an employee under paragraph (1) or

(2)) who performs services for remuneration for any person—
(A) as an agent-driver or commission-driver engaged in distributing meat products, vegetable products, fruit products, bakery products, beverages (other than milk), or laundry or dry-cleaning services, for his principal;
. . . .
(D) as a traveling or city salesman, other than as an agent-driver or commission-driver, engaged upon a full-time basis in the solicitation on behalf of, and the transmission to, his principal (except for side-line sales activities on behalf of some other person) of orders from wholesalers, retailers, contractors, or operators of hotels, restau-

sions of 26 U.S.C, Section 3306(i) the division shall consider the case law, Internal Revenue Service regulations and Internal Revenue Service letter rulings interpreting and applying that subsection.

Thus, in determining whether a worker is an employee or an independent contractor, the Division applies the common law "right to control" test and considers all case law, regulations and letter rulings interpreting I.R.C. § 3306(i).

■ In a 1987 revenue ruling, the IRS identified twenty factors to be used as guides in determining whether sufficient control is present to establish an employer-employee relationship. *See* Rev. Rul. 87–41, 1987–1 C.B. 296. Those twenty factors are:

(1) instructions; (2) training; (3) integration; (4) services rendered personally; (5) hiring, supervising, and paying assistants; (6) continuing relationship; (7) set hours of work; (8) full time required; (9) doing work on employer's premises; (10) order or sequence set; (11) oral or written reports; (12) payment by hour, week, month; (13) payment of business and/or traveling expenses; (14) furnishing of tools and materials; (15) significant investment; (16) realization of profit or loss; (17) working for more than one firm at a time; (18) making service available to general public; (19) right to discharge; and (20) right to terminate.

*Nat'l Heritage Enters., Inc. v. Div. of Emp't Sec.*, 164 S.W.3d 160, 167 (Mo.App. W.D.2005) (citing Rev. Rul. 87–41, 1987–1 C.B. 296). Missouri courts have routinely and consistently used these twenty factors as aids in determining whether a worker is an independent contractor or an employee. *K & D Auto Body Inc. v. Div. of Emp't Sec.*, 171 S.W.3d 100, 105 (Mo.App. W.D. 2005). Accordingly, we must analyze C.L.E.A.N.'s relationship with its workers pursuant to the twenty factors set out in Revenue Ruling 87–41.

■ Before addressing the twenty factors, we observe that throughout its briefing and oral argument on appeal, C.L.E.A.N. makes much of its claim that Wittenborn is an entrepreneur, and is conducting an entrepreneurial business. The gist of C.L.E.A.N.'s argument in this regard seems to be that an entrepreneur either cannot have employees, or for whatever reason, should not have to pay unemployment taxes for employees if they have employees. By definition, an "entrepreneur" is "the organizer of an economic venture; *esp:* one who organizes, owns, manages, and assumes the risks of a business." *Webster's Third New International Dictionary of the English Language Unabridged* 759 (1961). There is nothing about being an entrepreneur that precludes one from having employees or paying unemployment security taxes for those employees just like any other small or large business. Similarly, there is nothing that would require an entrepreneur to pay unemployment security taxes on behalf of an independent contractor hired to perform a service for the entrepreneur, again just like any other small or large business. Thus, we fail to see the significance of

rants, or other similar establishments for merchandise for resale or supplies for use in their business operations;

if the contract of service contemplates that substantially all of such services are to be performed personally by such individual; except that an individual shall not be included in the term "employee" under the provisions of this paragraph if such individual has a substantial investment in facilities used in connection with the performance of such services (other than in facilities for transportation), or if the services are in the nature of a single transaction not part of a continuing relationship with the person for whom the services are performed[.]

C.L.E.A.N.'s assertions regarding entrepreneurship.

■ Moving on to the twenty factors, we note that the Appeals Tribunal and the Commission found factors 8, 10, 12 and 13 favored independent contractor status. There is little, if any, disagreement between the parties as to those factors, and from our independent review of the record, those findings are supported by sufficient competent and substantial evidence. Therefore, we find those four factors favor independent contractor status, and we will not discuss them further. The Commission further found that factor 9 slightly favors independent contractor status as well. We disagree as to that factor, and it will be discussed further, *infra*.

### Factor 1—Instructions [6]

A worker who is required to comply with other persons' instructions about when, where, and how he or she is to work is ordinarily an employee. This control factor is present if the person or persons for whom the services are performed have the RIGHT to require compliance with instructions.

■ "With respect to the 'instructions' factor, the right to control is manifested in control over the 'when, where and how' work is completed." *Kirksville Publ'g Co. v. Div. of Emp't Sec.*, 950 S.W.2d 891, 897 (Mo.App. W.D.1997).

C.L.E.A.N. contends that the instruction factor favors independent contractor status because the work takes place in the client's home, and, thus, the "when, where and how" instruction is controlled by the client, not by C.L.E.A.N. However, although the work takes place in the client's home, C.L.E.A.N. makes the initial contact with the clients and sets forth a detailed cleaning checklist for that particular residence. C.L.E.A.N. workers are given that list prior to cleaning the client's home. Thus, C.L.E.A.N. workers receive instruction on how to clean the home of each respective C.L.E.A.N. client to which they are assigned.

C.L.E.A.N. avers that these lists merely convey the customers' preferences. While the lists do reflect the customers' preferences, they are still prepared by C.L.E.A.N., not the customer, and give detailed cleaning instructions regarding each particular home. Furthermore, C.L.E.A.N.'s agreement with its workers specifically states that the worker is responsible for cleaning the client's home "according to [the] specifications and expectations of the cleaning checklist." C.L.E.A.N., therefore, has the right to require compliance with the instructions provided in the cleaning checklists.

Moreover, although workers are responsible for scheduling their cleaning appointments with the clients, C.L.E.A.N. still exercises control over its workers' schedules. The record establishes that C.L.E.A.N. informs its workers as to the customers' preferences for scheduled cleanings. Workers are then required to "relay" all information regarding scheduling and rescheduling to Wittenborn. Steger also testified that when she had a conflict and could not make a scheduled cleaning, Wittenborn would "make arrangements" to resolve the situation. Thus, while the when and where aspects of a worker's cleaning assignment are determined by the client's preferences, C.L.E.A.N. maintains a certain degree of control over its workers' scheduling. Accordingly, Factor 1 favors employee status.

---

**6.** In our discussion of the factors, the initial paragraph following each heading is the descriptive comment quoted directly from Revenue Ruling 87–41.

### Factor 2—Training

Training a worker by requiring an experienced employee to work with the worker, by corresponding with the worker, by requiring the worker to attend meetings, or by using other methods, indicates that the person or persons for whom the services are performed want the services performed in a particular method or manner.

C.L.E.A.N. avers that the training factor favors independent contractor status because its workers work alone, without supervision, after their initial interviews. C.L.E.A.N.'s argument, however, is disingenuous. At the hearing, both Steger and Roark testified that they received training on how to clean clients' houses. Both explained that, prior to being paid, they were required to clean five to eight homes under the supervision of either Wittenborn or other experienced C.L.E.A.N. workers. Steger further testified to receiving training regarding the cleaning products and chemicals mixed by Wittenborn that C.L.E.A.N. workers are required to use.

Wittenborn testified on C.L.E.A.N.'s behalf that its workers volunteered to clean the initial five to eight homes. She further explained that these uncompensated cleanings constituted "situational interviews" that gave prospective workers an opportunity to be mentored and "learn as much as they could." The Commission, however, found Wittenborn's testimony to be less credible than the Division's witnesses and concluded that Wittenborn "provided an unrealistic explanation [as to] why the Workers would volunteer to clean multiple houses." Thus, the record reflects that C.L.E.A.N. used these initial, uncompensated cleanings to train its workers. Factor 2, therefore, also favors employee status.

### Factor 3—Integration

Integration of the worker's services into the business operations generally shows that the worker is subject to direction and control. When the success or continuation of a business depends to an appreciable degree upon the performance of certain services, the workers who perform those services must necessarily be subject to a certain amount of control by the owner of the business.

C.L.E.A.N. contends that integration is a neutral factor in this case because Wittenborn, as the owner of C.L.E.A.N., could continue to service C.L.E.A.N.'s clients without the assistance of additional workers if necessary. The record indicates, however, that C.L.E.A.N.'s success and continuation is dependent, to an appreciable degree, upon the services performed by C.L.E.A.N. workers. The Auditor testified that "the volume of clients [C.L.E.A.N.] had would pretty much mandate that [it]'d have to have additional workers to meet the client [sic] needs." And although Wittenborn testified that she would continue to clean homes without the assistance of additional workers, she admitted at the hearing that the loss of workers would force her to stop accepting new clients. Thus, because the additional workers hired by C.L.E.A.N. play an integral role in servicing the volume of C.L.E.A.N.'s clientele and the continued success of the business, Factor 3 favors employee status.

### Factor 4—Services Rendered Personally

If the Services must be rendered personally, presumably the person or persons for whom the services are performed are interested in the methods used to accomplish the work as well as in the results.

C.L.E.A.N. avers that Factor 4 favors independent contractor status because no

contractual obligation exists that requires its workers to render their services personally. The Commission, however, found that Steger and Roark credibly testified that they understood they were required to personally render their cleaning services to C.L.E.A.N. clients. Likewise, the Auditor testified that C.L.E.A.N. workers had to render services personally, as "they were not allowed to subcontract to anybody else."

Furthermore, the record establishes that C.L.E.A.N. workers held themselves out as representatives of C.L.E.A.N. and left C.L.E.A.N. business cards at clients' homes that included C.L.E.A.N.'s contact information. Wittenborn's testimony further indicated that the few instances of substitution that occurred involved one C.L.E.A.N. worker substituting for another C.L.E.A.N. worker. Such evidence combined with the fact that C.L.E.A.N. provided its workers with detailed instructions on how to clean its clients' homes indicates C.L.E.A.N. had an interest in its services being rendered personally by C.L.E.A.N. workers. Accordingly, Factor 4 favors employee status.

### Factor 5—Hiring, Supervising, and Paying Assistants

If the person or persons for whom the services are performed hire, supervise, and pay assistants, that factor generally shows control over the workers on the job. However, if one worker hires, supervises, and pays the other assistants pursuant to a contract under which the worker agrees to provide materials and labor and under which the worker is responsible only for the attainment of a result, this factor indicates an independent contractor status.

C.L.E.A.N. contends factor 5 is neutral because C.L.E.A.N. workers could hire assistants despite the fact that most of the workers did not. Steger and Roark testified, however, that they understood they could not hire assistants and that the only instances in which they had help cleaning clients' homes was when Wittenborn assigned a new worker to them for training. The Auditor likewise testified that C.L.E.A.N. workers did not have the ability to hire assistants.

The record indicates only one instance in which a non-C.L.E.A.N. worker assisted a C.L.E.A.N. worker in cleaning a customer's home. There is no indication in the record, however, that the C.L.E.A.N. worker actually hired, supervised, or paid that individual as an assistant. Furthermore, following the incident, the C.L.E.A.N. worker was removed from that customer's home, and Wittenborn testified that the worker "had made a poor judgment." Wittenborn further explained that she felt that C.L.E.A.N. workers would not "take it upon themselves to have someone in there and substitute and risk the relationship [with] ... their client and ... being paid." Accordingly, Factor 5 favors employee status.

### Factor 6—Continuing Relationship

A continuing relationship between the worker and the person or persons for whom the services are performed indicates that an employer-employee relationship exists. A continuing relationship may exist where work is performed at frequently recurring although irregular intervals.

C.L.E.A.N. asserts that factor 6 is neutral because the workers who developed the longest, continuing relationships are the same workers who have been determined to be independent contractors by the Commission. C.L.E.A.N.'s assertion, however, is without merit, as such is not the test for evaluating whether a continu-

ing relationship exists between C.L.E.A.N. and its workers.

The record indicates that C.L.E.A.N. workers expected to have a continuing relationship with C.L.E.A.N. There is no indication in the record that C.L.E.A.N. workers were hired for a single assignment or for a period of limited duration. Rather, when C.L.E.A.N. accepts a new client, Wittenborn would contact a worker to see if he or she would accept the assignment to clean that client's home. The worker was expected to establish rapport with the client and continue cleaning the client's house as scheduled on either a weekly, bi-weekly, or monthly basis. Thus, C.L.E.A.N. workers provided frequently recurring services to C.L.E.A.N. customers for an indefinite duration. Accordingly, the continuing relationship factor favors employee status.

### Factor 7—Set Hours of Work

The establishment of set hours of work by the person or persons for whom the services are performed is a factor indicating control.

C.L.E.A.N. contends that the Commission erred in concluding the set hours of work indicated employee status because C.L.E.A.N. does not set or establish set hours of work for its workers. The Commission determined that because a C.L.E.A.N. worker had to accomplish an assignment it accepted within a specific time period, the set hours of work factor was consistent with an employment relationship.

The record reflects that a worker could accept or decline assignments and that when workers cleaned clients home was dependent upon the clients' preferred day and time. Nevertheless, the Performance Bonus agreement indicates C.L.E.A.N. workers have a responsibility to "finish and follow-up to the customer's satisfaction within 24 hours." Furthermore, even though each worker is responsible for scheduling or rescheduling a cleaning, workers are required to inform Wittenborn of all scheduling and rescheduling information. Therefore, although C.L.E.A.N. does not establish set hours for its workers, it still exercises control over certain aspects of its workers scheduling. Accordingly, Factor 7 is neutral.

### Factor 9—Doing Work on Employer's Premises

If the work is performed on the premises of the person or persons for whom the services are performed, that factor suggests control over the worker, especially if the work could be done elsewhere. Work done off the premises of the person or persons receiving the services, such as at the office of the worker, indicates some freedom from control. However, this fact by itself does not mean that the worker is not an employee. The importance of this factor depends on the nature of the service involved and the extent to which an employer generally would require that employees perform such services on the employer's premises. Control over the place of work is indicated when the person or persons for whom the services are performed have the right to compel the worker to travel a designated route, to canvass a territory within a certain time, or to work at specific places as required.

◼ The Commission concluded that Factor 9 was "slightly suggestive of an independent contractor relationship" because the work was performed in the homes of clients and not on C.L.E.A.N.'s premises. However, this Court has indicated that if the particular nature of the business at issue requires the work to be performed off the employer's premises, the

factor of whether work is performed on the employer's premises is inapplicable. *K & D Auto Body,* 171 S.W.3d at 109 (explaining that the factor pertaining to whether work is performed on the employer's premise was inapplicable because the particular nature of the towing services performed by the drivers had to be carried out at locations other than the towing business's premises). Here, the very nature of the residential cleaning services provided by C.L.E.A.N. workers requires that the work be carried out at locations other than C.L.E.A.N.'s business office. Therefore, Factor 9 is inapplicable to our analysis.

### Factor 11—Oral or Written Reports

A requirement that the worker submit regular or written reports to the person or persons for whom the services are performed indicates a degree of control.

C.L.E.A.N. contends that the Commission erred in finding the weekly statements factor supported a finding of employee status because the reports are essentially invoices detailing which homes the worker had cleaned that week. Despite the fact that the weekly statements submitted by C.L.E.A.N. workers did, in some respects, act as an invoice of the services performed by the worker, the required weekly statements still indicate a degree of control by C.L.E.A.N. The record indicates that Wittenborn requires each worker to submit a specific form each week. Wittenborn further instructs its workers how to fill out the form, including how to calculate their performance bonuses and their weekly deductions for the leasing of equipment. Accordingly, the fact that these weekly forms are required by C.L.E.A.N., who dictates how the form is to be filled out and calculated, reflects C.L.E.A.N.'s degree of control over the workers. Factor 11, therefore, supports employee status.

### Factor 14—Furnishing of Tools and Materials

The fact that the person or persons for whom the services are performed furnish significant tools, materials, and other equipment tends to show the existence of an employer-employee relationship.

C.L.E.A.N. contends that Factor 14 favors independent contractor status because workers were required to furnish their own tools and materials. However, the agreement signed by C.L.E.A.N. workers indicated that "Robin A. Wittenborn agrees to provide the supplies, products and the equipment required by [a worker] to perform the work-related duties. [The worker] is in agreement to provide receipts for all items that she purchases." The workers also sign an "Independent Contractor Equipment Lease Agreement," which provided that Wittenborn, as C.L.E.A.N.'s owner, would lease to the worker all the necessary equipment, supplies, products, and materials necessary to clean a client's home. The agreement required workers to pay $10.00 to rent the equipment and necessary supplies each week. The evidence presented at the hearing established that C.L.E.A.N. leases equipment to 90% of its workers. Steger and Roark also testified that Wittenborn made her own cleaning supplies that she instructed C.L.E.A.N. workers to use in clients' homes. C.L.E.A.N. kept no inventory of the amount of supplies actually used by each worker. Rather, each worker was responsible for taking the amount of supplies and materials necessary to clean their clients' homes for the week. Furthermore, the $10.00 fee was non-negotiable and was automatically deducted from their weekly pay. The record, there-

fore, indicates that C.L.E.A.N. furnishes its workers with a significant amount of equipment, supplies, and materials necessary to carry out their cleaning services. Thus, Factor 14 favors employee status.

### Factor 15—Significant Investment

If the worker invests in facilities that are used by the worker in performing services and are not typically maintained by employees (such as the maintenance of an office rented at fair value from an unrelated party), that factor tends to indicate that the worker is an independent contractor. On the other hand, lack of investment in facilities indicates dependence on the person or persons for whom the services are performed for such facilities and, accordingly, the existence of an employer-employee relationship. Special scrutiny is required with respect to certain types of facilities, such as home offices.

C.L.E.A.N. avers Factor 15 favors independent contractor status because "C.L.E.A.N. workers must have a reliable automobile to do their work," which constitutes a significant investment for a part-time job. However, there is no evidence in the record that any C.L.E.A.N. worker made a significant investment in a vehicle for purposes of providing services to C.L.E.A.N. clients. Moreover, the general need for a vehicle to get to and from work does not constitute a type of investment "not typically maintained by employees." Additionally, there is no evidence in the record that C.L.E.A.N. workers made any investment, significant or otherwise, in facilities or workspaces for the purpose of performing services for C.L.E.A.N. Thus, the significant investment factor favors employee status.

### Factor 16—Realization of Profit or Loss

A worker who can realize a profit or suffer a loss as a result of the worker's services (in addition to the profit or loss ordinarily realized by employees) is generally an independent contractor, but the worker who cannot is an employee. For example, if the worker is subject to a real risk of economic loss due to significant investments or a bona fide liability for expenses, such as salary payments to unrelated employees, that factor indicates that the worker is an independent contractor. The risk that a worker will not receive payment for his or her services, however, is common to both independent contractors and employees and thus does not constitute a sufficient economic risk to support treatment as an independent contractor.

C.L.E.A.N. contends that Factor 16 favors independent contractor status because its workers "realize a profit by cleaning more houses per week" and "they are responsible for any damage at the job site." Such contributions, however, do not constitute the type of profit or loss required to support a finding of independent contractor status.

The greater profit a C.L.E.A.N. worker would realize from cleaning more houses per week is no different than the greater profit an hourly employee could realize simply by working more hours. Thus, there is no evidence in the record that C.L.E.A.N. workers realize a profit such to suggest they are independent contractors. Furthermore, the fact that C.L.E.A.N. workers are responsible for damages incurred at the job site is not the type of bona fide liability indicative of independent contractor status. Rather, as the record establishes, damages incurred at the job site were either deducted from the worker's pay or the worker's pay was withheld until he or she agreed to pay for the damage. Thus, C.L.E.A.N.'s policy of holding its workers responsible for dam-

ages incurred at the job site does not constitute a sufficient economic risk to support treatment as an independent contractor. Accordingly, Factor 16 favors employee status.

### Factor 17—Working for More Than One Firm at a Time

If a worker performs more than de minimis services for a multiple of unrelated persons or firms at the same time, that factor generally indicates that the worker is an independent contractor.

C.L.E.A.N. asserts that Factor 17 favors independent contractor status because C.L.E.A.N. workers could work for more than one firm at a time. Nevertheless, as the Commission found and the evidence establishes, each C.L.E.A.N. worker was required to sign a non-compete agreement. That non-compete agreement provided that during the time of the worker's service with C.L.E.A.N., the worker "will not accept nor will [he or] she engage in employment, consulting or any other business activity, directly related to the business of [C.L.E.A.N.]." The non-compete agreement further provides that C.L.E.A.N. workers could not engage "directly or indirectly in any business substantially similar to or in competition with the business of [C.L.E.A.N.] ... for a period of 1 years [sic] ... within a radius of 20 Miles from" C.L.E.A.N.'s office in Ballwin, Missouri. Under the agreement, engaging in any business substantially similar to or in competition with C.L.E.A.N. meant "(i) engaging in a business as an owner, partner, or agent; (ii) taking employment with a third party engaged in such business either as an employee, contractor, or consultant; [or] (iii) soliciting customers for the benefit of a third party engaged in such business." Thus, according to C.L.E.A.N.'s non-compete agreement, C.L.E.A.N. workers could not operate or take employment with any

business or firm directly related to or substantially similar to C.L.E.A.N.'s residential cleaning business. Factor 17, therefore, favors employee status.

### Factor 18—Making Services Available to the General Public

The fact that a worker makes his or her services available to the general public on a regular and consistent basis indicates an independent contractor relationship.

C.L.E.A.N. contends that Factor 18 favors independent contractor status, or, alternatively, neutral status, because C.L.E.A.N. workers could offer their services to the general public. Again, however, the non-compete agreement signed by C.L.E.A.N. workers prohibited workers from engaging in any business substantially similar to C.L.E.A.N. Furthermore, the record indicates that the workers found to be employees never made their services available regularly or consistently to the general public. Accordingly, Factor 18 supports employee status.

### Factor 19—Right to Discharge

The right to discharge a worker is a factor indicating that the worker is an employee and the person possessing the right is an employer. An employer exercises control through the threat of dismissal, which causes the worker to obey the employer's instructions. An independent contractor, on the other hand, cannot be fired so long as the independent contractor produces a result that meets the contract specifications.

C.L.E.A.N. avers that the right to discharge factor favors independent contractor status because workers could be discharged only if the work was not completed to the client's satisfaction. The record, however, reflects the contrary.

The Performance Bonus agreement, which is signed by each employee, provides that "[a]ny form of dishonesty regarding [the] company, to client, directed at partners, or any other act [of misconduct] will prompt immediate action and possible termination of the business partnership." The agreement gave examples of misconduct as lying, cheating, or stealing. Moreover, the Performance Bonus agreement includes a progressive system of penalties that result when a worker fails "to maintain the high standards [C.L.E.A.N.] uphold[s]." As part of the penalty system, the worker's fourth offense results in termination with no explanation necessary from C.L.E.A.N. Thus, given the threats of termination in C.L.E.A.N.'s Performance Bonus agreement, it is clear that C.L.E.A.N. used the threat of dismissal to control its workers' performance. Accordingly, Factor 19 favors employee status.

### Factor 20—Right to Terminate

If the worker has the right to end his or her relationship with the person for whom the services are performed at any time he or she wishes without incurring liability, that factor indicates an employer-employee relationship.

C.L.E.A.N. contends that the right to terminate factor favors independent contractor status because C.L.E.A.N. workers are under contract to provide 24–hour notice if they cannot complete a job once it is accepted. The record reflects that the contract between C.L.E.A.N. and its workers "can be terminated by either party by written/oral notification to the other party" and the contract becomes "null and void twenty-four (24) hours after notification." C.L.E.A.N. workers, therefore, can terminate their relationship with C.L.E.A.N. at any time by giving oral or written notice. C.L.E.A.N. avers that a worker could in-

cur legal liability for breach of contract by failing to clean an assigned home during the 24–hour window following notification. Such a slight risk of incurring liability suggests, at most, that Factor 20 is neutral.

■ To summarize, of the twenty factors set forth in Revenue Ruling 87–41, thirteen are indicative of employee status while four suggest independent contractor status. The remaining three factors are either neutral or inapplicable. But we cannot end our analysis there, as the twenty factors identified by the IRS are meant simply to be "guides or aids in determining the nature of the employment relationship, and are not the only factors to consider" in determining whether an employee-employer relationship exists. *K & D Auto Body,* 171 S.W.3d at 112 (internal quotation omitted).

Such additional factors for consideration were set forth in *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 752, 109 S.Ct. 2166, 2179, 104 L.Ed.2d 811 (1989): "(1) the provision of employee benefits, and (2) the tax treatment of the hired party." *Fritts v. Williams,* 992 S.W.2d 375, 385 (Mo.App. S.D.1999). The Commission made no findings regarding employee benefits; nevertheless, the record indicates that C.L.E.A.N. workers did not receive employee benefits. The Commission did, however, find that C.L.E.A.N. reports a worker's earnings to the IRS on a Form 1099 and that no federal or state income taxes or contributions were withheld from the workers' pay. Thus, these additional factors support independent contractor status.

Although C.L.E.A.N. emphasizes the Commission's lack of analysis regarding these two additional factors, the Commission's determination that C.L.E.A.N.'s workers are employees is still supported by sufficient competent and substantial ev-

idence in the record. As previously explained, a large majority of the factors (thirteen) favor a finding of employee status. And while we cannot rest a decision merely on a numerical count of factors, the overwhelming weight of the evidence establishes that C.L.E.A.N. had sufficient control over its workers to constitute an employer-employee relationship.

As the Commission concluded, the evidence establishes that C.L.E.A.N. retained a sufficient right to control its workers despite the fact that the workers could accept or decline assignments and were responsible for scheduling their cleanings with clients. The record reflects that Wittenborn, acting as C.L.E.A.N.'s owner, would perform the initial cleanings at potential customers' homes and provide the customers with estimates. She would then provide the assigned worker with a checklist that gave instruction as to how that client's home was to be cleaned. Further testimony at the hearing indicated that Wittenborn trained C.L.E.A.N. workers prior to sending them out to clean homes independently and workers were required to inform Wittenborn of any changes in the client's preferences. Likewise, Wittenborn required workers to relay all scheduling information to her, and testimony at the hearing from Steger indicated that Wittenborn even made scheduling arrangements for her when she was unable to make a scheduled cleaning at a client's home. Thus, C.L.E.A.N. maintained an ample amount of control over its workers' schedules and the services its workers provided.

C.L.E.A.N. places a great deal of significance upon the fact that the majority of its workers organized their own respective LLC. But as the record reflects, C.L.E.A.N. required its workers to estab-

lish an LLC once they earned over $600.00 with C.L.E.A.N., and, in at least one instance, it threatened to withhold a worker's pay until she organized an LLC. The fact that a worker organizes herself as an LLC because C.L.E.A.N. demanded that she do so does not magically make that worker an independent contractor. Rather, it is whether that worker is an independent contractor in fact based on application of the common law of agency. Moreover, there is no evidence in the record that the workers determined to be employees by the Commission ever held themselves out to C.L.E.A.N. customers as representatives of their respective LLC. To the contrary, the record establishes that workers left C.L.E.A.N. business cards, which contained C.L.E.A.N.'s contact information, and all checks received as payment for their services were made payable to C.L.E.A.N. Thus, C.L.E.A.N. workers were clearly held out to be representatives of C.L.E.A.N. Accordingly, given the circumstances of this case, the fact that some of the C.L.E.A.N. workers had organized their own LLC cleaning businesses is not indicative of independent contractor status.[7]

Overall, our review of the record and the weight of the factors indicate that C.L.E.A.N. retained a significant amount of control over its workers such to establish an employee-employer relationship exists. There is sufficient competent and substantial evidence in the record to support the Commission's determination that 26 of C.L.E.A.N.'s workers performed services for wages in employment and, thus, were not independent contractors. Accordingly, the Commission's decision was not against the weight of the evidence. Point denied.

7. We further note that C.L.E.A.N. never included the name of the worker's LLC on the 1099 Forms it filled out and filed on each worker's behalf.

In its second point, C.L.E.A.N. asserts that the Appeals Tribunal referee, acting on behalf of the Commission, failed to conduct a fair hearing and develop a full record in that the referee made a statement to suggest bias against C.L.E.A.N. and denied C.L.E.A.N. a fair opportunity to impeach the credibility of the Division's witnesses or rebut their testimony. At the commencement of the hearing, the following colloquy occurred between the Referee and counsel for the Division:

> The Division: May we ask, how do—do you typically question the Auditor first and then leave the attorney to supplement or—
>
> The Referee: Well, generally speaking, my goal is to—**to get the most valuable information as quickly as possible** so I would question the workers first, and then the Auditor, you can question the Auditor first. It really doesn't matter to me.

(emphasis added). C.L.E.A.N. contends that the bolded language quoted above establishes that the Referee impermissibly expressed bias against C.L.E.A.N. and improperly indicated her opinion as to the merits of the case.

"[A] referee must observe the strictest impartiality and show no favor to either of the parties by her conduct, demeanor or statements." *Scrivener Oil Co. v. Crider*, 304 S.W.3d 261, 272 (Mo.App. S.D.2010). Nevertheless, we presume "that administrative decision-makers act honestly and impartially, and a party challenging the partiality of the decision-maker has the burden to overcome that presumption." *Id.* (internal quotation omitted).

Here, C.L.E.A.N. failed to overcome the presumption that the Referee was honest and impartial. The challenged comment was made in response to the Division's question of whether the Referee preferred that the Auditor testify first at the hearing or whether the Referee preferred to hear other evidence first. Thus, when read in context, the Referee's remark merely reflects her preferences regarding the order of the Division's witnesses at the hearing. It does not indicate any bias toward C.L.E.A.N. or constitute a comment as to the merits of the case.

C.L.E.A.N. further avers that it was denied a fair proceeding on the basis that it was not allowed to impeach the credibility of the Division's witnesses or rebut their testimony. C.L.E.A.N. contends that it is within the Referee's discretion to be lenient in applying the rules of civil procedure when issues of importance are introduced out of order, especially by a *pro se* party.

We recognize that an administrative hearing "need not be conducted according to the common law or statutory rules of evidence or the technical rules of procedure." 8 C.S.R. § 10–5.015(10)(B)4; *see also Bridges v. Mo. S. State Univ.*, 362 S.W.3d 436, 441 (Mo.App. S.D.2012). However, to be admissible, evidence must not be irrelevant, immaterial, privileged or unduly repetitious. 8 C.S.R. § 10–5.015(B)4. Furthermore, "[i]t is within the discretion of the fact-finder as to whether to admit or exclude evidence and such a decision will not be overturned absent an abuse of discretion." *Hubbell Mech. Supply Co. v. Lindley*, 351 S.W.3d 799, 810 (Mo.App. S.D.2011) (internal quotation omitted).

Here, C.L.E.A.N. complains of several objections sustained by the Referee but provides no further discussion or analysis as to why the Referee's evidentiary rulings were erroneous. Without any further legal explanation as to why the Referee erred in sustaining the Division's objections, we cannot say that the Referee's evidentiary rulings constitute an abuse of

discretion. Furthermore, our review of the record reflects that the Referee was considerate of the fact that Wittenborn was acting *pro se* on C.L.E.A.N.'s behalf and allowed Wittenborn sufficient latitude throughout the proceedings. Accordingly, C.L.E.A.N. failed to establish how it was denied a fair proceeding before the Appeals Tribunal. Point denied.

Judgment affirmed.

All concur.