The BEDFORD FALLS COMPANY, Dartmouth Crossing, Inc., and Townco, Ltd., Appellants,

v.

DIVISION OF EMPLOYMENT SECURITY, Respondent.

Nos. WD 56594, WD 56596 and WD 56598.

Missouri Court of Appeals, Western District.

Submitted June 16, 1999.

Decided Aug. 24, 1999.

Charles F. Dufour, Jr., St. Louis, for Appellant.

Sharon A. Willis, Government Counsel, Kansas City, for Respondent.

Before HOWARD, P.J., ULRICH and SMART, JJ.

PER CURIAM.

In this consolidated appeal, The Bedford Falls Company, Dartmouth Crossing, Inc., and Townco Ltd. (collectively "the Companies") appeal the decision of the Labor and Industrial Relations Commission holding them liable for unemployment insurance taxes for services rendered by various classes of workers. Because we conclude that the Companies failed to carry their burden of proof on the issues, we affirm the decision of the Commission.

## Factual Background

The Companies are related corporations involved in new home construction and sales. Nicholas Dalba, Sr. is the chief executive officer of each of the individual corporations. This appeal involves the classification of three classes of workers who work for the Companies. The first class of workers is comprised of James Stoff, Michael Chaber, James Trautwein, Michael Purcell, Michael Van Doren and Paul Dalba (collectively referred to as "the laborers"). The second class is comprised of Jane Nugent, a greeter. The final class is comprised of Nicholas Dalba, Jr., a salesman.

In 1997, Michael Van Doren filed a claim for unemployment insurance benefits, claiming that he had worked as an employee for the Companies. James Rook, a field auditor with the Division of Employment Security ("Division"), investigated whether Mr. Van Doren would in fact be classified as an employee of the Companies. Mr. Rook obtained information through a questionnaire completed by Mr. Van Doren. Mr. Rook did not talk with any of the other individuals referred to as "laborers." As part of his investigation, Mr. Rook met with Nicholas Dalba, Sr., President of the Companies. Mr. Rook also met with Barbara Burton, the Companies' office manager.

Through his investigation, Mr. Rook learned that the Companies were engaged in the construction and sale of residential housing in subdivisions developed by one of the corporations. Mr. Rook learned that Mr. Van Doren, along with several other individuals, had provided cleaning services at the Companies' construction sites. Mr. Rook completed two twenty-factor questionnaires: one with Mr. Van Doren, and one while in Mr. Dalba, Sr.'s office. Mr. Rook also spoke with Ms. Nugent, the greeter, by telephone. Mr.

Rook's investigation revealed the following facts:

### The Laborers

Mr. Van Doren and the other laborers were provided work opportunities on an occasional basis. They were paid hourly. They received their job assignments from Frank Chaber, the project manager, by telephone, the night before they were to work. When they had completed a job, the laborers would notify Mr. Chaber and receive their next assignment. The laborers were furnished a schedule to follow regarding a job's completion date, but otherwise were not given an order in which the jobs had to be completed.

The laborers' business expenses included small hand tools, boots and gloves. They were not reimbursed for these expenses. The Companies furnished cleaning supplies at the work site, along with extra brooms and shovels. Occasionally, the Companies furnished a dump truck, which was leased on an hourly basis. Anyone working at a job site could use the truck to haul waste material from the houses.

The Companies provided the laborers with a written set of instructions or procedures. The laborers received no training. The Companies never required that any particular individual perform the services. If the work was not completed satisfactorily, the laborers were sent back to correct the errors. They were paid for this corrective work, and their pay was not docked for mistakes.

### The Greeter

Mr. Rook spoke with Ms. Nugent, the greeter, by telephone. He learned that Ms. Nugent was paid an hourly wage, and her hours were set by the sales manager. Her hours varied depending upon the subdivision in which she was working. She usually worked between ten and fourteen hours per week. She was responsible for finding a replacement greeter when she needed to be absent from work. There was no evidence that she paid the wages of her replacement greeter. Ms. Nugent was not given job instructions, procedural guidelines or an employee manual.

Ms. Nugent's job entailed welcoming people into the model homes, giving them general information about the development and assessing their interest level. She was responsible for providing the Companies with a written report detailing the "traffic count" and the interest level of potential buyers.

### The Salesperson

The Companies also used the services of Nicholas Dalba, Jr. as a real estate salesperson. Mr. Dalba, Jr. was not licensed as a real estate agent or broker during most of the time in question. He obtained an agent's license in 1997. Dalba, Jr. was paid a one-percent commission on the homes he sold. Dalba, Jr. was paid through a weekly draw. The amount he drew was then paid back to the Companies through the generation of commissions. If the amount drawn by Dalba, Jr. exceeded the commissions he earned, he was responsible for making up the difference.

### The Companies' Relationship with the Workers

The Companies had "oral contracts" with each of the workers in question. When asked whether, pursuant to these agreements, the Companies could extract a penalty if the workers left a job before it was completed, Dalba, Sr. replied in the negative. Further, when asked whether the workers were free to come and go as they chose, Dalba, Sr. replied, "None of our subcontractors are [sic] free to do anything on our jobs ... [t]hey must notify us when they're going to be there and not be there." The Companies utilized time cards for their workers, which were filled out by the workers and turned in every Thursday. The Companies indicated that the time cards were for "budgeting purposes only." The Companies' relation-

ship with the workers could be ended at any time by either party without penalty. All of the workers' monetary compensation was reported on a Form 1099 as opposed to a Form W–2.

### Administrative Determination

After considering the facts of the current case, a deputy for the Division determined that each of the workers was an employee rather than an independent contractor and that the Companies were employers within the meaning of Chapter 288. The Division held that the Companies were liable for paying unemployment insurance taxes on the wages paid to these individuals. The Companies appealed the deputy's determinations to the appeals tribunal. After a hearing on the matter, the appeals tribunal affirmed the deputy's determinations. The Companies appealed to the Labor and Industrial Relations Commission ("Commission"). The Commission affirmed and adopted the decisions of the appeals tribunal. The Companies now appeal the Commission's decision to this court.

### Standard of Review

■■■ Our review of the Commission's decision is governed by § 288.210, RSMo 1994.[1] "The findings of the [C]ommission as to the facts, if supported by competent and substantial evidence ... shall be conclusive, and the jurisdiction of [this] court shall be confined to questions of law." § 288.210, RSMo Supp.1998. Our function is to determine, based upon the entire record, whether the Commission could have reasonably made its findings and reached its end result. *Stanton v. Division of Employment Sec.*, 799 S.W.2d 202, 203 (Mo.App.1990). We may not substitute our judgment for that of the Commission. *Theus v. Industrial Comm'n*, 554 S.W.2d 516, 517 (Mo.App.1977). We view the evidence in the light most favorable to

the Commission's findings, and we draw all reasonable inferences therefrom which support the Commission's decision. *Pulitzer Publ'g Co. v. Labor & Indus. Relations Comm'n*, 596 S.W.2d 413, 419 (Mo. banc 1980).

### Independent Contractor v. Employee

The Companies' first claim is that the Commission's decision was not based on competent and substantial evidence because none of the alleged employees appeared or testified at the hearing. The Companies argue that the only witness at the hearing testifying in behalf of the Division was Mr. Rook, who admitted that he had spoken only with two of the alleged employees, Mr. Van Doren and Ms. Nugent, rather than all of the alleged employees, in completing the twenty-point questionnaire he relied on in concluding that all of the workers in question were in fact employees. They suggest that it was necessary as a matter of law to interview each of the alleged employees. In their second point on appeal, the Companies argue that the Commission's decision that the workers in question were employees rather than independent contractors was not supported by competent and substantial evidence.

### Burden of Proof

■■■ Section 288.034.5, RSMo 1994 provides:

Service performed by an individual for remuneration shall be deemed to be employment subject to this law unless it is shown to the satisfaction of the division that such services were performed by an independent contractor. In determining the existence of the independent contractor relationship, the common law of agency right to control shall be applied. The common law of agency right to control test shall include but not be limited to: if the alleged employer retains the

---

1. All statutory references are to the Revised Statutes of Missouri, 1994, unless otherwise indicated.

right to control the manner and means by which the results are to be accomplished, the individual who performs the service is an employee. If only the results are controlled, the individual performing the service is an independent contractor.

Once it is shown that an individual receives remuneration, the presumption of an employer-employee relationship is established. The burden of proof shifts to the employer to show that, under the common law right to control test, the worker is an independent contractor. "Concomitant with the burden of proof is the risk of nonpersuasion." *Burns v. Labor & Indus. Relations Comm'n*, 845 S.W.2d 553, 556 (Mo. banc 1993). *Burns* applied § 288.034.5, RSMo 1986 which provided, in pertinent part:

[S]ervice performed by an individual for remuneration shall be deemed to be employment subject to this law unless it is shown to the satisfaction of the division that:

(1) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and

(2) Such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

(3) Such individual is customarily engaged in an independently established trade, occupation, profession or business.

In 1989, § 288.034.5 was amended and the three-pronged test was replaced by the common law of agency right to control test. *Burns*, 845 S.W.2d at 557. The

amendment did not change the employer's burden of proving that the workers in question were independent contractors once the Division established that the workers received remuneration. *Id.* at 556.

Mr. Rook talked to Mr. Van Doren and Ms. Nugent. Mr. Rook also interviewed Mr. Dalba, the chief executive officer, and Mrs. Burton, the office manager, in the course of gathering the information in question. The testimony of Mr. Rook and the presentation of Form 1099s established that the Companies paid the laborers, Ms. Nugent[2] and Mr. Dalba, Jr. the following amounts in 1996 and 1997:

| Worker | 1996 | 1997 |
|---|---|---|
| James Stoff | $2,731.00 | $ 4,812.00 |
| John Trautwein | $ 948.50 | $ 0.00 |
| Mike Chaber | $ 96.00 | $ 410.00 |
| Mike Purcell | $ 54.00 | $ 0.00 |
| Mike Van Doren | $ 570.00 | $ 65.00 |
| Jane Nugent | $ 30.00 | $ 0.00 |
| Nicholas Dalba, Jr. | $ 850.00 | $15,626.00 |

Consequently, under the common law of agency control test, the burden of proving that the workers were independent contractors rather than employees shifted from the Division to the Companies. *Id.* The admissibility of Mr. Rook's testimony is not challenged. The Companies were not required to offer evidence, but because the burden shifted, the Companies were, in effect, electing to take the risk of not presenting evidence. Thus, the fact that none of the alleged workers testified in person at the hearing does nothing to assist the Companies. If anything, it may have worked against the Companies. Because there was evidence of the compensation of these individuals (through form 1099's and the testimony of Mr. Rook), a *prima facie* case was presented, and the burden shifted to the Companies to prove the individuals in question were independent contractors.[3]

---

**2.** We are baffled by the fact that Ms. Nugent's 1099 shows she was paid $30.00 in 1996 (and there is no indication she was paid anything in 1997) when the evidence showed that she generally worked 10 to 14 hours per week for

a period of three years. Neither party addresses this discrepancy.

**3.** The Companies also make a related argument, citing *McDonald v. Labor and Industrial Rel. Comm'n*, 789 S.W.2d 69 (Mo.App.1990)

## Substantial Evidence

 The next contention on appeal is that the decision is not supported by substantial evidence. Substantial evidence is defined as competent evidence from which a trier of fact can reasonably decide the case. *Garrett v. Overland Garage & Parts, Inc.*, 882 S.W.2d 188, 191 (Mo.App. 1994). When determining whether the Commission's decision is supported by substantial evidence, we engage in a two-step process:

> In the first step, the court examines the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award, to determine if the record contains sufficient competent and substantial evidence to support the award. If not, the Commission's award must be reversed. If there is competent and substantial evidence supporting the award, the court moves to the second step, where it views the evidence in the light most favorable to the award, but must consider all evidence in the record, including that which opposes or is unfavorable to the award, take account of the overall effect of all of the evidence, and determine whether the award is against the overwhelming weight of the evidence.

*Davis v. Research Med. Ctr.*, 903 S.W.2d 557, 571 (Mo.App.1995).

 In interpreting § 288.034.5, the common law rules used in determining an employer-employee relationship under 26 U.S.C. § 3306(i) are applied.[4] 8 CSR 10–4.150. Further, in applying 26 U.S.C. § 3306(i), the Division "shall consider the case law, Internal Revenue Service regulations and Internal Revenue Service letter rulings interpreting and applying that subsection." *Id.* In Revenue Ruling 87–41, the IRS set forth twenty common law factors to be considered when determining whether a worker is an employee or an independent contractor: (1) whether a worker is required to comply with another's instructions as to when, where or how he is to work; (2) whether the worker is trained by the employer; (3) whether the worker's services are integrated into the employer's business operations; (4) whether the services must be rendered personally; (5) whether the worker hires, supervises and pays assistants; (6) whether there is a continuing relationship between the worker and the employer; (7) whether the employer has established set hours for the worker to work; (8) whether the employer's work requires the worker to work substantially full-time; (9) whether the work is done on the employer's premises; (10) whether a worker is required to perform the work in an order or sequence established by the employer; (11) whether the worker is required to regularly report to the employer; (12) whether the worker is paid on an hourly or weekly basis, or by-the-job or on a commission basis; (13) whether the worker is reimbursed by the employer for his work-related expenses; (14) whether the worker furnishes his own tools; (15) whether the worker invests in and maintains facilities from which he works; (16) whether the worker can realize a profit or loss; (17) whether the worker is working for more than one firm at a time; (18) whether the worker makes his services available to the general public; (19) whether the employer has the right to discharge the worker; and (20) whether the worker has the right to end his relationship with the employer at any time

that because the laborers did not themselves testify, the Division failed to present enough facts about their circumstances to create a prima facie case. This argument is based on a misunderstanding of that portion of *McDonald* that dealt with 30 or 40 unnamed, unidentified siding applicators about whom no evidence was received. *Id.* at 71.

4. 26 U.S.C. § 3606(i) references the definition of employee found in 26 U.S.C. § 3121. Section 3121 defines an employee as "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." 26 U.S.C. § 3121(d)(2).

without incurring liability. Rev. Rule 87–41. The purpose of these factors is to identify elements which indicate an employer's amount of control over a worker. No one factor is determinative, although some may be more important than others. *Edward Lowe Indus., Inc. v. Division of Employment Sec.*, 865 S.W.2d 855, 863 (Mo.App.1993). The "bedrock is still the common law agency test of the right to control the manner and means of performance." *Travelers Equities Sales, Inc. v. Division of Employment Sec.*, 927 S.W.2d 912, 925 (Mo.App.1996).

### 1. The Laborers

■ We view the evidence and the reasonable inferences drawn therefrom, in the light most favorable to the Commission's determination that the laborers were employees rather than independent contractors. *Pulitzer Publ'g Co.*, 596 S.W.2d at 419. The laborers received job assignments by telephone the night before they worked, from Mr. Chaber, the project superintendent. When a project was completed, the laborers notified Mr. Chaber and the laborers would get their next assignment. The laborers were paid on an hourly basis and were required to manually keep time cards. All of the work was done on the Companies' premises. The laborers were not free to do anything other than work while on the employer's premises, although occasionally they were excused for personal errands. Any laborer could be terminated at any time. Although the work was seasonal, the Companies had a continuing relationship with some of the laborers, especially James Stoff, who apparently participated in most of the jobs, because he earned far more than any other laborer. Mr. Stoff desired to be treated as an independent contractor so that he could enjoy favorable tax treatment for his pick-up truck, pager, and cellular phone, all of which he asserted he used in his work. The Companies furnished cleaning supplies, as well as extra brooms and shovels at the construction sites. Further, the Companies would sometimes rent a dump truck, which the Companies leased on an hourly basis; anyone working at the job site could use the truck to haul away construction waste.

The laborers did not hire and fire their own assistants.[5] There is no specific evidence that the laborers were given on-site supervision regarding *how* a job was to be completed; they were instructed merely to complete the job. Nor is there specific evidence that anyone supervised their efficiency. However, they were paid on an hourly basis and were required to work while at the job site. As a general rule, the unsupervised engagement of hourly workers is less than satisfactory. Accordingly, the suggestion that these hourly laborers worked entirely without supervision could reasonably be met with some skepticism by the Commission. Because the company elected not to ask any of the laborers to testify, the Commission may have tended to believe there was more to the story than meets the eye. It is necessary to keep in mind that the Companies had the burden of overcoming the presumption of employment status.

The Commission found that "[w]eighing these factors in light of the ultimate issue of whether the appellant had the right to control the manner and means by which the [l]aborers' work was performed ... the [Companies] ha[d] not met its burden of showing that the workers were not subject to the [Companies'] control in that regard. In view of the fact that hourly laborers are traditionally not independent contractors, and in view of the fact that the

---

5. Although a laborer on one occasion brought a friend or family member to the job to help clean the construction site, such incidents were not the norm. Moreover, the Commission could conclude that this *ad hoc* worker was paid by the Companies rather than the laborer who brought him. For instance, Mike Purcell was paid a total of $54.00 in 1996 and nothing in 1997. It is reasonable to infer he was the "ad hoc" worker and not a regular laborer.

Companies had the burden of proof, we cannot say the Commission's decision was wrong. There were factors militating both ways. Some of the most significant items indicating employment are the fact that the laborers were paid hourly rather than on the basis of a specified, contracted amount per construction site; the fact that the company provided the truck and the substantial tools; and the fact that a worker could be terminated at any time, for any reason, even in the middle of a job.

It is obvious that elaborate efforts went into constructing the relationship so that it would meet the test of independent contractor status. In fact, the brief of the appellants asserts that the Companies had no employees at all. Thus, we can assume great attention and effort went into attempting to structure all human resource relationships so as to be able to avoid unemployment taxes, workers' compensation insurance, and payroll taxes. Still, the fact remains that this type of work (manual labor) generally requires an employer-employee relationship, and the Companies may not have persuaded the Commission that there was not at least some de facto supervision. Also, if a job was not satisfactorily done, the laborers were sent back and were paid for the additional time just as if it were ordinary work. None of these things are consistent with independent contractor status. Had the Companies presented the testimony of any of the laborers to the appeals tribunal, such testimony might have shed some more light on the unusual nature of the relationship, and the Companies might have been able to overcome the presumption. However, looking at all of the factors in light of the Companies' burden of proving that the laborers were independent contractors, we find that there was

substantial evidence supporting the Commission's finding that the laborers were employees, not independent contractors.

## 2. The Greeter

■ We now turn to the Commission's conclusion that Ms. Nugent, the greeter, was an employee rather than an independent contractor. Ms. Nugent greeted potential customers who visited the Companies' model homes. She was responsible for handing out literature and sales materials to the potential customers, as well as directing them to various displays in the model homes. Ms. Nugent was also responsible for assessing the interest level of potential customers. Ms. Nugent was required to provide the Companies with written reports tracking the traffic count in the various model homes, as well as the interest levels of potential customers. To complete her job, Ms. Nugent had use of a desk and phone in the model homes; she incurred no business expenses. Ms. Nugent had worked in this capacity with the Companies for three years. She was paid an hourly rate, and her hours were set by a sales manager. It was a part-time job for her; she generally worked 12 to 14 hours per week.

Ms. Nugent was not given specific instructions as to how to complete her job. The Companies did not provide an employee manual, procedural guidelines or any training to Ms. Nugent. If she had to be absent from work, Ms. Nugent arranged for her replacement, who would be paid by the Companies. Ms. Nugent's hours would vary, depending upon the identity of the company for which she was working. She worked approximately ten to fourteen hours per week. Ms. Nugent provided her own name tag and provided the Companies with a certificate of liability insurance.[6]

6. The record is somewhat unclear as to whether this was automobile insurance or commercial general liability insurance. It is difficult to imagine Ms. Nugent purchasing general commercial liability insurance as a part-time "greeter." Whatever it was, the Commission could have regarded the insur-

ance requirement as merely part of the "window dressing" utilized by the Companies to create the appearance of independent contractor status. The Companies offered no explanation as to any practical reason such insurance should be required from Ms. Nugent.

Ms. Nugent's wages were recorded on a Form 1099, not a Form W–2.

The fact that she was paid hourly is consistent with employment status. The fact that no one trained her on how to greet people is not particularly significant, because the ability to greet people comes naturally to those appropriately gifted. The fact that she provided her own name tag is not of consequence, assuming we are talking about an ordinary name tag. The fact that she was required to furnish the company with detailed records on potential customers is consistent with employment status. In light of the presumption of Ms. Nugent's employee status, there was substantial evidence before the Commission to support its finding that Ms. Nugent was an employee, not an independent contractor.

### 3. The Salesperson

Nicholas Dalba, Jr. began working as a salesperson for the Companies in 1996. He became a licensed agent or broker sometime in 1997. Dalba, Jr. received a one percent commission on the houses he sold. In 1996, he was paid a weekly draw against commissions, which was paid back through the generation of commissions. If Dalba, Jr.'s draws exceeded the commissions he earned, then he was responsible for making up the difference. Dalba, Jr. used a timecard to keep track of the number .of hours worked for the Companies, although he was not compensated on an hourly basis. There is no evidence that his daily schedule was directed by the Companies.

The fact that Dalba, Jr. received remuneration for his services raised the presumption that he was an employee. The Companies, in rebutting this presumption, however, showed that Dalba, Jr. was paid only commissions. It also appears (although the record is not explicit in this regard) that Dalba, Jr. was not supervised as to the method or manner of carrying out his duties. Compensation based solely upon commissions is often quite consistent with an independent contractor relationship. Although this factor is weakened somewhat by the fact that Dalba, Jr. was paid a weekly draw, the fact that the draws were reconciled with the commissions tends to preserve the notion of pure commission compensation.

■ We note also that the selling of real estate is often accomplished on a commission basis, and that real estate sales is a distinct profession with a tradition of independent contractor status. Thus, many factors here suggest independent contractor status. However, one factor stands out as quite significant – the fact that Dalba, Jr. was unlicensed as to most of the period in question. Engaging in real estate sales as an independent contractor would have been illegal for Dalba, Jr. § 339.020 RSMo 1994. Because the Commission was entitled to assume that Dalba, Jr. and the Companies sought to conform their conduct to law, the Commission could have concluded that the real estate sales work was conducted in a lawful capacity as an employee rather than as an independent contractor.

### Previous Determinations Regarding Related Corporations

■ In their third point on appeal, the Companies argue that the Commission erred in determining that the Companies were employers for purposes of employment security law because the IRS had previously performed an audit on Northco, Inc., a corporation related to the Companies, and approved an identical relationship as being one of independent contractor status. Similarly, in their fourth and final point on appeal, the Companies argue that the Commission erred in determining that the Companies were employers for purposes of employment security law because the Division had previously made the determination that an employer-employee relationship did not exist in a related company.

The Companies presented the following evidence on these issues: Mr. Rich, the

Companies' CPA, testified that in the fall of 1997, the IRS had audited Northco's 1995 taxable year. Mr. Rich further testified that it was his "understanding" that "the method of obtaining individuals to do laboring work" was the same for Northco as for the Companies, and to the best of his knowledge, "[t]he situation was identical to the one at issue here." Mr. Rich testified that the outcome of the audit was "no change" and that no additional taxes, penalties or interest were assessed against Northco. No documentation as to facts of the audit was presented to the Commission.

Ms. Burton, the Companies' office manager, testified that in 1992, the Division examined whether Northco's workers should be classified as employees or independent contractors. Ms. Burton testified that Northco reported its workers' wages on a Form 1099, and no taxes were withheld from their wages. The Division ultimately approved Northco's treatment of its workers as independent contractors. Although Ms. Burton recalled receiving correspondence and documentation from the Division on the matter, the Companies were unable to locate any documentation to present to the Commission in the present matter. Ms. Burton offered her opinion that "the manner and method of paying for the services of the employees at Northco [was] the same as for the people that provided services for [the Companies]."

The Companies fail to present us with any authority for the proposition that the Division and the Commission are bound by any audits previously made by the Division and the Internal Revenue Service. Instead, the Companies simply point to the public policy in consistency and uniformity of treatment, citing the Division's regulations at 8 CSR 10–4.150 (which seeks to ensure that interpretations of § 288.034.5 are consistent with the Internal Revenue Code and IRS rulings) and a remark to a similar effect in *Travelers Equities,* 927 S.W.2d at 921. The Companies tend to merge together two concepts which are separate concepts: (1) the concept of consistent treatment between state and federal government; and (2) the concept of consistent treatment at different times by the same state agency. The authorities mentioned by the Companies relate only to the first concept and have no bearing on the second concept. In any event, it is not necessary for us to decide whether the Division is required to take a position which is consistent with any position taken after audit by the IRS, because here, the only information before the Commission concerning the IRS audit of Northco's 1995 taxable year was the oral testimony of Mr. Rich and Ms. Burton. No documentation from the audit was presented to the Commission. An audit is much less formal than an IRS letter ruling, which would be far more authoritative. Finally, the Commission was not required to believe that the facts presented in the 1995 audit were identical to the facts before the Commission. Credibility is the province of the Commission. *See Scott v. Wheelock Bros.,* 357 Mo. 480, 209 S.W.2d 149, 151 (1948). As for the second concept (some sort of estoppel against the state, we assume), the Companies present no authority for the proposition that the Division cannot later change its mind, especially with regard to a different period of time (1996–1997) than that of the first audit (1992). Accordingly, Points III and IV are denied.

### Conclusion

There is nothing wrong with a corporation undertaking elaborate efforts to structure all its human resource relationships as independent contractor relationships. There is also, however, a distinction between form and substance. The Commission is not forbidden to discern between the two.

The decision of the Commission is affirmed.