

# In the
# Missouri Court of Appeals
# Western District

417 PET SITTING, LLC,       )
           )
         Appellant,       )    WD83833
           )
v.                    )    OPINION FILED: October 27, 2020
           )
DIVISION OF EMPLOYMENT    )
SECURITY,             )
           )
         Respondent.      )

## Appeal from the Labor and Industrial Relations Commission

Before Division Four: Cynthia L. Martin, Chief Judge, Presiding, Gary D. Witt, Judge
and Anthony Rex Gabbert, Judge

417 Pet Sitting, LLC ("Pet Sitting"), appeals from a decision by the Labor and Industrial Relations Commission ("Commission"), which found that workers engaged as pet caretakers performed services for Pet Sitting in "employment," and for "wages," within the meaning of sections 288.034[1] and 288.036, respectively. Pet Sitting argues that there was insufficient competent evidence in the record to support the Commission's decision. We affirm the Commission's decision.

---

[1]All statutory references are to RSMo 2016 as supplemented unless otherwise indicated.

**Factual and Procedural Background**[2]

Pet Sitting is a residential pet care operation offering services such as feeding, walking, entertainment, medication administration, and general household chores. Amanda Brown ("Brown"), Pet Sitting's sole owner and operator, started the business for supplemental income. Since Pet Sitting's inception, Brown has personally provided pet sitting services. While Brown still personally provides pet care services, she has expanded the business and it now compensates numerous sitters to provide pet care. Both Brown and Danielle Rakow ("Rakow"), an Unemployment Insurance Tax Auditor for the Missouri Division of Employment Security ("Division"), provided testimony indicating that Pet Sitting would not be able to provide its level of services without the existence of its sitters.

Pet Sitting advertises for prospective sitters on its website. The site advises that Pet Sitting desires sitters who "are looking to become a part of the team." Potential sitters must submit an application, interview, and undergo a background check. Pet Sitting does not provide formal training to its sitters, although it publicizes that its sitters are trained professionals. They are permitted, but not required, to purchase a uniform shirt from Pet Sitting. They do not have personal business cards. Sitters are bonded and insured by Pet Sitting. They meet once a month at Brown's office.

Pet Sitting advertises its caretaking services via radio and magazine ads, business cards, its website, and a logo on Brown's car. Clients can schedule visits and free

---

[2]"In reviewing the Commission's decision, an appellate court must view the evidence objectively, not in the light most favorable to the decision of the Commission." *Barron v. Div. of Emp't Sec.*, 435 S.W.3d 654, 657 (Mo. App. W.D. 2014) (quoting *Kimble v. Div. of Emp't Sec.*, 388 S.W.3d 634, 638 (Mo. App. W.D. 2013)).

consultations on Pet Sitting's website, www.417petsitting.com. Brown controls sitter and client assignments, making logistical decisions based on location, required services, and specific client and sitter schedules.

Once sitters are assigned a client, they meet the client in their home, bringing along provided documentation from Pet Sitting. The client instructs the sitter on how to medicate, water, walk, and feed their animals. Pet Sitting requires its sitters to follow these instructions, and it requests that sitters input client notes into an online database. The client provides physical materials, including food, leashes, medication, and toys.

Brown testified that the business has an established and continuing relationship with its sitters, and they often have multiple client assignments at one time. Some assignments require specific timing, as such, those sitters have established routines for particular days, in order to meet multiple clients' needs. Pet Sitting counsels and advises sitters on their duties and client complaints. Pet Sitting can remove sitters from particular assignments at any time, and sitters are free to decline assignments.

Pet Sitting and its sitters sign an "Independent Contractor Agreement," which is reviewed every six months. Under the contract, sitters pledge to "fulfill any other duties reasonably requested by [Pet Sitting] and agreed to by [the sitter]," and also agree that Pet Sitting can terminate the relationship if the sitter "fails or refuses to comply with the written policies or reasonable directive of [Pet Sitting]" or "is guilty of serious misconduct in connection with performance hereunder . . . ." Brown and Rakow testified that both Pet Sitting and its sitters have a right to end the relationship without penalty.

3

Sitters also agree that they will not assign any of their rights under the contract, or delegate the performance of any of their duties under the contract, without prior written consent. Angelee Snow ("Snow"), a sitter for Pet Sitting, also reported to the Division that she was not permitted to utilize helpers. Clients sign a contract acknowledging that for the "security of [their] property, third parties are absolutely NOT permitted on [their] premises under the terms of this agreement."

Pet Sitting maintains an office, where Brown works. Sitters are permitted, but not required to use the office space. Pet Sitting provides an online time reporting system, on which sitters are required to enter their time in order to be paid. The system then creates an invoice to bill the client. Pet Sitting pays its sitters per task on a set rate, with sitters receiving 60 percent of each invoice and Pet Sitting receiving 40 percent. Pet Sitting pays its sitters for completed tasks, regardless of whether a client actually pays the invoice.

The sitters' contract states sitters "shall bill" and Pet Sitting "shall reimburse" the sitters "for all reasonable and approved out-of-pocket expenses." However, sitters are responsible for all of their own travel expenses. Rakow testified that sitters can receive "minor reimbursements" if the client runs out of something, but she could not provide an example. Finally, Brown testified that Pet Sitting does not reimburse for business or travel expenses.

In February, 2018, the Division informed Pet Sitting that an investigation had determined that its sitters had performed services in employment, as defined in section

4

288.034, since January 1, 2015. Similarly, the Division determined that the remuneration received by the workers constituted wages under section 288.036.

Pet Sitting appealed the Division's decision to the Division's Appeals Tribunal ("Tribunal"). After a hearing, the Tribunal described the factual testimony and evidence *infra* as credible, and found that "testimony by the parties contrary" was not credible. The Tribunal analyzed the twenty factors identified by the Internal Revenue Service ("IRS") as guides for determining employment status and found that sixteen factors indicated an employer-employee relationship, while four factors suggested independent contractor status. The Tribunal affirmed the Division's determination, finding that the sitters are employees of Pet Sitting. Pet Sitting filed an application for review with the Commission. After a review, two of the three Commissioners affirmed and adopted the Tribunal's decision, while one Commissioner dissented. This timely appeal followed.

**Standard of Review**

The Commission's decision "is reviewed to determine whether it is 'supported by competent and substantial evidence upon the whole record.'" *Gateway Taxi Mgmt. v. Div. of Emp't Sec.*, 461 S.W.3d 830, 832 (Mo. banc 2015) (quoting Mo. Const. art. V, section 18). "Section 288.210 further provides that upon appellate review of a decision of the Commission in an employment security case, '[t]he findings of the [C]ommission as to the facts, if supported by competent and substantial evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the appellate court shall be confined to questions of law.'" *Timster's World Found. v. Div. of Emp't Sec.*, 495 S.W.3d 211, 217 (Mo. App. W.D. 2016) (quoting section 288.210). Pursuant to section 288.210, the

5

appellate court "may modify, reverse, remand for rehearing, or set aside the decision of the Commission on the following grounds and no other: (1) the Commission acted without or in excess of its powers; (2) the decision was procured by fraud; (3) the facts found by the Commission do not support the award; or (4) there was no sufficient competent evidence in the record to warrant the decision." *Id.* (citing section 288.210). "Whether the award is supported by competent and substantial evidence is judged by examining the evidence in the context of the whole record." *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 (Mo. banc 2003).

> In our review of the correctness of the Commission's legal conclusion that, based on the facts found by the Commission, the workers were employees . . . rather than independent contractors, "we exercise our own independent judgment and do not defer to the Commission's conclusion, including the way in which it arrived at that conclusion by balancing, weighing, and applying the various facts it found."

*Timster's*, 495 S.W.3d at 217 (quoting *K & D Auto Body, Inc. v. Div. of Emp't Sec.*, 171 S.W.3d 100, 103 (Mo. App. W.D. 2005)). "However, on matters of witness credibility, we will defer to the Commission's determinations." *Id.* (quoting *Lucido v. Div. of Emp't Sec.*, 441 S.W.3d 172, 174 (Mo. App. W.D. 2014)).

### Analysis

Pet Sitting raises one point on appeal, arguing that the Commission erred in affirming the Appeals Tribunal's conclusion that Pet Sitting's sitters are employees "because there was insufficient competent evidence in the record to support the decision . . . ." Pet Sitting argues that the competent evidence, when taken as a whole, establishes that its sitters are independent contractors.

6

Whether a worker is an employee or an independent contractor is determined pursuant to section 288.034.5 and 8 C.S.R. 10-4.150(1).[3] *Haggard v. Div. of Emp't Sec.*, 238 S.W.3d 151, 156 (Mo. banc 2007). Section 288.034.5 provides:

> Service performed by an individual for remuneration shall be deemed to be employment subject to this law unless it is shown to the satisfaction of the division that such services were performed by an independent contractor. In determining the existence of the independent contractor relationship, the common law of agency right to control shall be applied.

Based on this portion of section 288.034.5, "once it is shown that an individual receives remuneration, the presumption of an employer-employee relationship is established and the 'burden of proof shifts to the employer to show that, under the common law right to control test, the worker is an independent contractor.'" *Gateway*, 461 S.W.3d at 833 (quoting *Bedford Falls Co. v. Div. of Emp't Sec.*, 998 S.W.2d 851, 856 (Mo. App. W.D. 1999)). Pet Sitting does not challenge the fact that their sitters receive remuneration for their services. Thus, Pet Sitting bears the burden to establish that its sitters are independent contractors, rather than employees, under the common law right to control test. *See Gateway*, 461 S.W.3d at 834.

Section 288.034.5 further provides:

> The common law of agency right to control test shall include but not be limited to: if the alleged employer retains the right to control the manner and means by which the results are to be accomplished, the individual who performs the service is an employee. If only the results are controlled, the individual performing the service is an independent contractor.

---

[3]All regulatory references are to the Missouri Code of State Regulations (July 31, 2014) unless otherwise indicated.

7

Additionally, in interpreting section 288.034.5, "the division shall apply the common law rules applicable in determining the employer-employee relationship under 26 U.S.C., Section 3306(i)." 8 C.S.R. 10-4.150(1); *accord Gateway*, 461 S.W.3d at 834. Moreover, in applying 26 U.S.C. section 3306(i), "the division shall consider the case law, Internal Revenue Service regulations and Internal Revenue Service letter rulings interpreting and applying that subsection." 8 C.S.R. 10-4.150(1).

This includes considering the IRS's Rev. Rul. 87-41, 1987-1 C.B. 296, in which the IRS identifies twenty factors "for determining whether sufficient control is present to establish an employer-employee relationship." *Timster's*, 495 S.W.3d at 219. These factors are:

> (1) instructions; (2) training; (3) integration; (4) services rendered personally; (5) hiring, supervising, and paying assistants; (6) continuing relationship; (7) set hours of work; (8) full time required; (9) doing work on employer's premises; (10) order or sequence set; (11) oral or written reports; (12) payment by hour, week, month; (13) payment of business and/or traveling expenses; (14) furnishing of tools and materials; (15) significant investment; (16) realization of profit or loss; (17) working for more than one firm at a time; (18) making service available to general public; (19) right to discharge; and (20) worker's right to terminate.

*Gateway*, 461 S.W.3d at 834 (citing Rev. Rul. 87-41). "The factors are not intended to serve as a bright-line rule with no flexibility, but rather are indices of control . . . ." *Timster's*, 495 S.W.3d at 220 (quoting *E.P.M. Inc. v. Buckman*, 300 S.W.3d 510, 514 (Mo. App. W.D. 2009)). "The degree of importance attached to each factor varies depending on the type of work and individual circumstances, and the relevant factors should be considered in inquiring about employment status with no one factor being decisive." *Id.* (quoting *E.P.M. Inc.*, 300 S.W.3d at 514). "The focus of the inquiry must

8

be the degree to which the employer has the right to control the manner and means of performance." *Id.* (quoting *Nat'l Heritage Enters. v. Div. of Emp't Sec.*, 164 S.W.3d 160, 167 (Mo. App. W.D. 2005)).

In determining whether Pet Sitting has met its burden of establishing that its sitters are independent contractors under the common law right to control, "we examine the factors challenged by [Pet Sitting] in light of the Commission's factual findings." *Timster's*, 495 S.W.3d at 220.[4] The initial paragraph of each relevant factor is the descriptive comment provided in Rev. Rul. 87-41, with some citations omitted. *See id.*

### *Factor 1--Instructions*

A worker who is required to comply with other persons' instructions about when, where, and how he or she is to work is ordinarily an employee. This control factor is present if the person or persons for whom the services are performed have the right to require compliance with instructions.

With this factor, "the right to control is manifested in control over the 'when, where and how' work is completed." *C.L.E.A.N., LLC v. Div. of Emp't Sec.*, 405 S.W.3d 613, 621 (Mo. App. W.D. 2013) (quoting *Kirksville Pub. Co. v. Div. of Emp't Sec.*, 950 S.W.2d 891, 897 (Mo. App. W.D. 1997)). "[I]t is not necessary that the employer actually direct and control the manner in which services are performed; it is sufficient if he or she has the right to do so." *E.P.M. Inc.*, 300 S.W.3d at 516 (quoting *Higgins v. Mo. Div. Emp't Sec.*, 167 S.W.3d 275, 287 (Mo. App. W.D. 2005).

---

[4]Because the Appeals Tribunal and Commission found that they favored independent contractor status, Pet Sitting does not challenge Factors 2, 8, 12, and 17, and the Division does not dispute the Commission's findings on these factors. Thus, we will only discuss the remaining factors which are challenged by Pet Sitting and disputed by the Division. *See Timster's*, 495 S.W.3d at 220 n.8.

Pet Sitting argues that because its clients, rather than the company, provide sitters with instructions on "when, where, and how" to care for their animals, that this factor should favor independent contractor status. Indeed, once Pet Sitting assigns a sitter to a client and instructs them to report for an initial meeting, the client then instructs the sitter on when and how to medicate, water, walk, and feed their animals.

However, Pet Sitting controls the sitter assignments for particular time periods and retains the authority to remove sitters from an assignment, indicating that it controls when and where sitters perform their services. The record also reflects that not only can Pet Sitting advise its sitters on their services, but it also counsels sitters concerning client complaints, which demonstrates a degree of control regarding the manner in which sitters perform their duties.

Moreover, Pet Sitting requires that its sitters follow client instructions, indicating that it also indirectly controls the manner in which sitters perform their duties. Sitters sign a contract with Pet Sitting pledging to "fulfill any other duties reasonably requested by [Pet Sitting] and agreed to by [the sitter]," and also agree that Pet Sitting can terminate the relationship if it found that the sitter failed or refused to comply with reasonable directives or was "guilty of serious misconduct in connection with performance" under the contract. Thus, not only does Pet Sitting reserve the right to direct and control the manner in which its sitters perform their services, they actually exercise such control. *See E.P.M. Inc.*, 300 S.W.3d at 516.

10

Pet Sitting has not shown that this factor favors finding that the sitters were independent contractors. Competent and substantial evidence supports the Commission's findings related to this factor. This factor favors an employer-employee relationship.

*Factor 3--Integration*

> Integration of the worker's services into the business operations generally shows that the worker is subject to direction and control. When the success or continuation of a business depends to an appreciable degree upon the performance of certain services, the workers who perform those services must necessarily be subject to a certain amount of control by the owner of the business.

"The integration factor refers to whether a business could continue without the contribution of the services in question; as such, integral services are more likely to be subject to the business' control." *K & D Auto Body*, 171 S.W.3d at 107 (quoting *Nat'l Heritage Enters.*, 164 S.W.3d at 168).

Pet Sitting contends that it merely acts as a "middleman," by providing a matching service between pet sitters, "who actually provide the services with pet owners, and not the actual provision of pet sitting service," and that their sitters do not participate in matching services. However, sufficient competent evidence in the record establishes that Pet Sitting exists primarily to provide pet care services to its clients, and it provides these services via pet sitters. Brown concedes that in addition to controlling client and sitter assignments, she personally provides pet sitting services to clients, suggesting that Pet Sitting is not merely a matching service for pet sitters and clients. Further, Pet Sitting's monthly group meetings, and the fact that Pet Sitting advertises that it desires applicants

11

who "are looking to become a part of the team," suggest that the company engages a group of unified employees, rather than providing a match making service to its clients.

Moreover, the record reflects that Pet Sitting could not continue its operation without its sitters, as Brown testified that without the help of her other sitters, she would have to work twenty-four hours a day in order to continue providing the same level of care to her clients. Rakow also testified, "Ms. Brown may be able to do a few herself but to be able to, uh, complete this business at the level that they are, they need these [sitters] to exist." As such, substantial and competent evidence exists in the record to support the Commission's finding that Pet Sitting's success and continuation depends on its sitters' services. We find that this factor favors an employer-employee relationship.

*Factor 4--Services Rendered Personally*

> If the Services must be rendered personally, presumably the person or persons for whom the services are performed are interested in the methods used to accomplish the work as well as in the results.

Pet Sitting does not dispute that it requires its sitters to sign a contract agreeing that they will not assign any of their rights under the contract, or delegate the performance of any of their duties under the contract, without prior written consent. Without further explanation or support from the record, Pet Sitting contends that these are not blanket prohibitions; rather, the agreement can be modified by mutual agreement. However, there is substantial and competent evidence in the record establishing that Pet Sitting expects its sitters to personally perform their duties. Sitters are subjected to an application process and background check before they are permitted to enter a client's home. After receiving a specific client assignment, sitters must personally meet their

12

client and introduce themselves so that the client knows who is entering their home. Pet Sitting's clients also sign a contract acknowledging that for the "security of [their] property, third parties are absolutely NOT permitted on [their] premises under the terms of this agreement." This security assurance, coupled with consistent sitter background checks, illustrates that the repute of Pet Sitting's business hinges on service commission for clients who are familiarized with their particular sitter. Finally, the Commission found that Pet Sitting individually bonds its sitters, a fact which suggests that its hired sitters must complete the services personally, so that they are insured.

Pet Sitting's expectation that its sitters personally provide their services to clients reveals an interest in the methods and manner of pet care. The Commission's finding that this factor suggests a right held by Pet Sitting to control its sitters is supported by substantial and competent evidence. This factor demonstrates an employer-employee relationship.

*Factor 5--Hiring, Supervising, and Paying Assistants*

> If the person or persons for whom the services are performed hire, supervise, and pay assistants, that factor generally shows control over the workers on the job. However, if one worker hires, supervises, and pays the other assistants pursuant to a contract under which the worker agrees to provide materials and labor and under which the worker is responsible only for the attainment of a result, this factor indicates an independent contractor status.

Pet Sitting argues that the Commission's conclusion that workers are not permitted to hire assistants is not supported by the evidence because there is not a prohibition; rather, Brown testified that she allows sitters to hire assistants. While there was testimony from Brown that sitters are allowed to hire assistants, and that one had done so,

13

there was also credible evidence in the record establishing the opposite, and we are obligated to defer to the Commission's credibility determinations. *Timster's*, 495 S.W.3d at 217. The Commission found credible evidence establishing that sitters are not permitted to hire assistants, in that the plain language of their contract prohibits them from assigning or delegating any of their duties without written consent, signaling Pet Sitting's desire to control the provision of services. Snow also reported that she was not permitted to utilize helpers to complete her services. Moreover, Pet Sitting's consistent sitter background checks, and promise to clients that third parties would not enter their home, also reflect Pet Sitting's desire to control who is hired to perform and assist with its residential pet care services. Therefore, there is sufficient competent evidence in the record to support the Commission's finding that this factor suggests a right to control sitters, and thus an employer-employee relationship. *See C.L.E.A.N.*, 405 S.W.3d at 623 (concluding that because there was ample evidence establishing that residential cleaners knew they were not permitted to hire assistants, this factor favored employer-employee status).

*Factor 6--Continuing Relationship*

> A continuing relationship between the worker and the person or persons for whom the services are performed indicates that an employer-employee relationship exists. A continuing relationship may exist where work is performed at frequently recurring although irregular intervals.

Pet Sitting contends that this factor should favor independent contractor status because the nature and duration of each sitter's assignment is set according to the client's needs, not Pet Sitting's needs. Further, sometimes the tasks are short-term. However, the

14

fact that clients determine when and how long they will need services does not negate the fact that a continuing relationship exists between Pet Sitting and its sitters. Brown testified that the business has an established and continuing relationship with its sitters. Sitters sign a contract, which Pet Sitting reviews every six months. Further, the record reflects that sitters are often assigned to multiple clients at a time, based on client needs and sitters' schedules. When a relationship with one client is only short-term, or it ends, Pet Sitting can then match that sitter with another client according to availability and desired schedule. Thus, the relationship continues, even when a particular client is no longer in need of Pet Sitting's services. The Commission's finding of a continuing relationship is supported by substantial and competent evidence in the record. We find that Pet Sitting's continuing relationship with its sitters indicates an employer-employee relationship.

*Factor 7--Set Hours of Work*

The establishment of set hours of work by the person or persons for whom the services are performed is a factor indicating control.

Pet Sitting argues that the Commission should have concluded that this factor weighed in favor of independent contractor status because the Commission specifically found that the sitters do not have fixed hours of work; rather, their schedules are set by the clients. Where there is an absence of fixed hours for workers, but the person or persons for whom services are performed still exercises control over particular aspects of scheduling, this factor should be weighed neutrally. *C.L.E.A.N.*, 405 S.W.3d at 624. While it is true that Pet Sitting does not necessarily establish a fixed work schedule for its

15

sitters, Pet Sitting does still exercise some degree of control over its sitters' schedule, in that it controls to which clients sitters are assigned on certain days. Though the Commission found this factor indicates an employer-employee relationship, we conclude that this factor is neutral.

*Factor 9--Doing Work on Employer's Premises*

> If the work is performed on the premises of the person or persons for whom the services are performed, that factor suggests control over the worker, especially if the work could be done elsewhere. Work done off the premises of the person or persons receiving the services, such as at the office of the worker, indicates some freedom from control. However, this fact by itself does not mean that the worker is not an employee. The importance of this factor depends on the nature of the service involved and the extent to which an employer generally would require that employees perform such services on the employer's premises. Control over the place of work is indicated when the person or persons for whom the services are performed have the right to compel the worker . . . to work at specific places as required.

The Commission concluded that because sitters have no choice but to perform their duties in client homes, as Pet Sitting requires, that this factor favors employer-employee status. However, with this factor, "if the particular nature of the business at issue requires the work to be performed off the employer's premises, the factor of whether work is performed on the employer's premises is inapplicable." *C.L.E.A.N*, 405 S.W.3d at 624-25 (citing *K&D Auto Body*, 171 S.W.3d at 109) (concluding that "the very nature of residential cleaning services" requires their work be done outside of the business office; thus, the factor was inapplicable).

Pet Sitting provides residential pet sitting services, including walking, watering, feeding, medication administration, and other general household chores. While Pet

16

Sitting does have an office from which its owner works, the sitters perform their work solely in clients' homes. We find that the very nature of Pet Sitting's residential pet sitting service requires that the sitters perform their work in clients' homes, and not at Pet Sitting's office. Though the Commission found this factor to favor an employer-employee relationship, we find this factor to be inapplicable.

*Factor 10--Order of Sequence Set*

> If a worker must perform services in the order or sequence set by the person or persons for whom the services are performed, that factor shows that the worker is not free to follow the worker's own pattern of work but must follow the established routines and schedules of the person or persons for whom the services are performed. Often, because of the nature of an occupation, the person or persons for whom the services are performed do not set the order of the services or set the order infrequently. It is sufficient to show control, however, if such person or persons retain the right to do so.

The Commission found that Pet Sitting requires its sitters "to follow the routines set forth by the client, such as times for play, feedings, walks, and medications. This factor favors employee status." Pet Sitting argues that the Commission's finding indicates that the sequence is actually set by the client, rather than Pet Sitting, so this factor should favor independent contractor status.

While it is true that the clients set procedures for their pets' care, it is Pet Sitting that controls its sitters' routines in that it assigns sitters to various clients based upon client needs, location, and sitters' schedules. Some of these assignments require specific timing, as such, a sitter would have an established route or routine for a particular day, in order to meet the needs of multiple clients at a particular time. By scheduling sitters in this manner, Pet Sitting controls the sequence of its sitters' work.

17

Furthermore, as the descriptive comment indicates, even if the record did not reflect that Pet Sitting exercises its right to control the order or sequence of its sitters' services, it is sufficient to demonstrate control if Pet Sitting retains the right to determine the order or sequence.  The record reflects that Pet Sitting does retain such a right, in that it controls sitter assignments and removals, as well as retains a right to terminate a sitter if they fail to comply with duties reasonably requested by the company.  The Commission's finding that this factor indicates an employer-employee relationship is supported by substantial and competent evidence; thus, we find the factor favors an employer-employee relationship.

*Factor 11--Oral or Written Reports*

> A requirement that the worker submit regular or written reports to the person or persons for whom the services are performed indicates a degree of control.

Pet Sitting does not contest that it requests that sitters enter client notes into an online database, or that it requires sitters to input their completed tasks into a time recording website which then generates invoices to bill the client.  However, Pet Sitting relies on *C.LE.A.N. v. Division of Employment Security* to assert that because there was "no further testimony" as to specific instructions or mandatory frequency of these requirements, that this factor should be weighed in their favor, or, in the alternative, neutrally.  405 S.W.3d at 625 (concluding that the company exhibited a degree of control over its residential cleaners who were required to submit a specific form each week which the company thoroughly explained how to complete).  Here, it can be inferred from the evidence in the record that Pet Sitting explains to its sitters how to input their

completed tasks into the provided website, because Snow conveyed that this is how she reports her time, and this reporting is required before sitters are paid. Because the sitters received wages, they certainly must have entered their time into the website, which then generated an invoice. The absence of evidence indicating an explicit deadline does not negate that there was sufficient competent evidence in the record establishing that Pet Sitting exhibits a degree of control by requiring time reports to their provided website before a sitter is paid. Substantial evidence supports the Commission's determination that this factor indicates the existence of an employer-employee relationship.

*Factor 13--Payment of Business and/or Traveling Expenses*

> If the person or persons for whom the services are performed ordinarily pay the worker's business and/or traveling expenses, the worker is ordinarily an employee. An employer, to be able to control expenses, generally retains the right to regulate and direct the worker's business activities.

Pet Sitting contends that the evidence established that reimbursements are rare, and that there was no evidence that expenses are used to exert control over the means and manner of the sitters' work. The Division asserts that Pet Sitting's argument ignores the Commission's finding regarding the plain language of the contractual agreement which states sitters "shall bill" and Pet Sitting "shall reimburse" the sitters "for all reasonable and approved out-of-pocket expenses."

The record reflects that sitters are responsible for all of their own travel expenses when traveling to and from client locations. Snow indicated that traveling was her only expense incurred with the job. Clients provide all physical materials; however, Rakow testified that "there could be some minor reimbursements if [sic] something ran out;" yet,

19

she could not provide an example.  Finally, despite the language regarding expenses in the contract, Brown testified that sitters do not receive any payment for business or travel expenses.

The inquiry for this factor is whether Pet Sitting *ordinarily* pays for sitters' business or travel expenses.  They do not pay for any travel expenses.  The substantial and competent evidence in the record does not establish that Pet Sitting ever pays or reimburses a sitter for any other business expense.  Further, there is no indication that any potential reimbursements were used to exercise control over the manner and means of the sitters' services.  We reject the Commission's determination that substantial and competent evidence finds this factor to indicate an employer-employee relationship, and instead conclude that the substantial and competent evidence indicates that this factor favors independent contractor status. *See Nat'l Heritage Enters.*, 164 S.W.3d at 171.

*Factor 14--Furnishing of Tools and Materials*

The fact that the person or persons for whom the services are performed furnish significant tools, materials, and other equipment tends to show the existence of an employer-employee relationship.

Pet Sitting contends that because its clients supply all physical materials, including food, leashes, medication, and toys, that this factor should favor independent contractor status.  However, the Commission concluded that Pet Sitting furnishes significant tools, materials, and equipment because it reserves the right to purchase additional food and supplies if necessary, and because it provides an office and technology to run the business.  The Division also argues on appeal that the sitters are not similarly situated to typical independent contractors because they do not furnish their own supplies; for

20

example, as a painter would bring his own brushes and materials. However, the inquiry is not whether the sitters furnish their own tools, materials, and equipment; rather, it is whether Pet Sitting furnishes significant tools, materials, and equipment. There is sufficient competent evidence to support the Commission's conclusion that Pet Sitting provides an office, office equipment, time-keeping and invoice software, as well as documents for each client, indicating that they do in fact furnish significant tools, materials, and equipment essential to the performance of the sitters' work. This factor demonstrates the existence of an employer-employee relationship.

*Factor 15--Significant Investment*

> If the worker invests in facilities that are used by the worker in performing services and are not typically maintained by employees . . ., that factor tends to indicate that the worker is an independent contractor. On the other hand, lack of investment in facilities indicates dependence on the person or persons for whom the services are performed for such facilities and, accordingly, the existence of an employer-employee relationship. Special scrutiny is required with respect to certain types of facilities, such as home offices.

Pet Sitting contends that the nature of its pet care services requires that sitters perform services in client homes, and not Pet Sitting's office. Pet sitting thus contends that because sitters do not utilize the facilities, this factor should be weighed in Pet Sitting's favor, or, in the alternative, neutrally. However, this Court has recognized that even where workers do not utilize company facilities in performing their services, a lack of evidence indicating their significant investment in such facilities still favors employee status. *See C.L.E.A.N.*, 405 S.W.3d at 626 (concluding that residential cleaners who performed all of their duties in clients' homes did not make any investment in their

21

company's facilities or workplaces for the purpose of performing services; thus, the factor favored employer-employee status). Here, Brown testified that sitters do not make any sort of investments in Pet Sitting, and the record lacks evidence establishing otherwise. Substantial and competent evidence supports the Commissions determination that this factor indicates the existence of an employer-employee relationship.

*Factor 16--Realization of Profit or Loss*

A worker who can realize a profit or suffer a loss as a result of the worker's services (in addition to the profit or loss ordinarily realized by employees) is generally an independent contractor, but the worker who cannot is an employee. For example, if the worker is subject to a real risk of economic loss due to significant investments or a bona fide liability for the expenses, such as salary payments to unrelated employees, that factor indicates that the worker is an independent contractor. The risk that a worker will not receive payment for his or her services, however, is common to both independent contractors and employees and thus does not constitute a sufficient economic risk to support treatment as an independent contractor.

The Commission found that because Pet Sitting pays its sitters per task, it is unlikely they would realize a profit or suffer a loss. Pet Sitting argues that because sitters are paid per task, they bear a risk of loss if a client does not pay their invoice. However, as indicated in the descriptive comment, the sitter's risk of loss must be in addition to losses ordinarily realized by employees; further, the risk of losing payment for completed services is a risk which is ordinarily realized by employees and independent contractors. Furthermore, Brown explicitly testified that Pet Sitting bears the risk of loss if a job is unprofitable, and that sitters are paid for completed tasks, regardless of whether the client has paid Pet Sitting. Accordingly, there is substantial and competent evidence in the record establishing the sitters cannot realize a profit or suffer a loss in addition to the

22

profit or loss ordinarily realized by employees. This factor favors an employer-employee relationship.

*Factor 18--Making Service Available to General Public*

The fact that a worker makes his or her services available to the general public on a regular and consistent basis indicates an independent contractor relationship.

Pet Sitting asserts that the Commission's decision favoring an employer-employee relationship "was made without evidence one way or the other;" however, Pet Sitting does not set forth any evidence establishing which relationship status this factor favors. Pet Sitting contends that this factor should be weighed neutrally.

Relevant to the inquiry is whether the sitters advertised or represented themselves to the public as independent pet sitters. *Timster's*, 495 S.W.3d at 222-23 (citing *K & D Auto Body*, 171 S.W.3d at 112). The record reflects that sitters perform work under Pet Sitting's name, rather than their own. Pet Sitting operates a website under the URL www.417petsitting.com, which contains links for clients to "Schedule Pet Sitting" and "Schedule a Free Consultation." Pet Sitting advertises its sitting services via radio and magazine ads, business cards, their website, and a logo on the owner's car. Sitters do not have individual business cards. Sitters may purchase uniform shirts from Pet Sitting, although they are not mandatory work attire. Finally, Pet Sitting's client agreement states, "[Pet Sitting] agrees to provide loving care for the pets specified," indicating the sitters perform their caretaking services under Pet Sitting's name, rather than their own.

23

There is substantial and competent evidence indicating that sitters do not advertise or otherwise hold themselves out as independent pet sitters to the general public. As such, this factor favors employer-employee status.

*Factor 19--Right to Discharge*

> The right to discharge a worker is a factor indicating that the worker is an employee and the person possessing the right is an employer. An employer exercises control through the threat of dismissal, which causes the worker to obey the employer's instructions. An independent contractor, on the other hand, cannot be fired so long as the independent contractor produces a result that meets the contract specifications.

Pet Sitting concedes that the testimony presented supports a conclusion that the company can discharge its sitters at any time. However, Pet Sitting argues that due to the nature of its business, the Commission should not have given this factor significant weight. However, our Courts have examined this factor along with similar business models which provided residential services; therefore, we will analyze this relevant factor along with the other contested factors and weigh it accordingly. *See C.L.E.A.N.*, 405 S.W.3d at 627-28 (analyzing relationship between residential cleaning company and its cleaners); *Fritts v. Williams*, 992 S.W.2d 375, 384-85 (Mo. App. S.D. 1999) (analyzing relationship between residential plumbing company and substitute plumber).

There is sufficient competent evidence in the record establishing that Pet Sitting can terminate its sitters at any time, in that Brown testified that Pet Sitting has a right to end the relationship without penalty; further, the plain language of the contract between Pet Sitting and its sitters reiterates this right. Pet Sitting's ability to fire sitters without penalty establishes control over its sitters because, as expressed in Rev. Rul. 87-41, Pet

Sitting can threaten dismissal in order to obtain a sitter's compliance. This is exemplified by the fact that Pet Sitting counsels sitters on client complaints and other areas of their job. Competent and substantial evidence supports the Commission's finding that Pet Sitting can discharge its sitters without liability. This factor indicates Pet Sitting's right to control its sitters and an employer-employee relationship.

*Factor 20--Right to Terminate*

> If the worker has the right to end his or her relationship with the person for whom the services are performed at any time he or she wishes without incurring liability, that factor indicates an employer-employee relationship.

Similar to the right to discharge factor, Pet Sitting asserts that the Commission should not have given this factor significant weight because the Commission did not make a specific finding as to the consequences of a sitter terminating the relationship during one of their jobs, as opposed to between client assignments. Brown and Rakow testified that sitters have a right to end their contract with Pet Sitting at any time, and the contract is silent as to any financial liability that they would potentially incur. The record does not indicate that this right changes based on whether termination occurs during or in between jobs. Actually, there is evidence to the contrary, in that when specifically asked what transpires when a sitter quits in the middle of an assignment, Brown merely testified that she would have to find a replacement. She did not relay that the sitter could incur an additional consequence or liability. Therefore, there is substantial and competent evidence supporting the Commission's finding that sitters can end the relationship at any time, without liability. This factor favors finding an employer-employee relationship.

25

### *Summary of Factors*

We conclude that nineteen of twenty factors are relevant to Pet Sitting's circumstances, and that thirteen of the relevant factors indicate an employer-employee relationship and a right to control the manner and means of the sitters' services, while one factor is neutral and five factors indicate an independent contractor relationship. While we recognize that "[t]here is no magic formula for determining how many factors must weigh in favor of an employee relationship," *Haggard*, 238 S.W.3d at 157, we find that the fact that Pet Sitting retains its right to direct and control sitters by counseling sitters regarding client complaints, the existence of its specific prohibition of delegating work to third parties, the possibility of sitter dismissal for failed compliance, and its extensive dependence on its sitters' services, are all factors which are particularly demonstrative of an employer-employee relationship.

Pet Sitting bears the burden to prove that its sitters were independent contractors rather than employees. In light of the numerous factors indicative of an employer-employee relationship, Pet Sitting has failed to sustain its burden to prove that its sitters were independent contractors under the common law right to control test. Based upon the whole record, competent and substantial evidence supports finding that the sitters are employees. *See* Mo. Const. art. V, section 18.

The Point is denied.

26

**Conclusion**

The decision of the Commission is affirmed.

_Cynthia L. Martin_
Cynthia L. Martin, Judge

All Concur